PENSION BENEFIT GUARANTY COR-
PORATION, Plaintiff–Appellant,
Cross–Appellee,

David H. Miller and William W.
Shaffer, Intervenors–Appellants,

v.

The LTV CORPORATION and LTV
Steel Company, Inc.,
Defendants–Appellees,

Official Committee of Unsecured Credi-
tors of LTV Corporation, Subcommit-
tee of Parent Creditors of the Official
Committee of Unsecured Creditors of
LTV Corporation, LTV Bank Group,
Official Committee of Equity Security
Holders, BancTexas Dallas, N.A., Fifth
Third Bank, Huntington National Bank
and Citibank, N.A., Intervenors–Appel-
lees,

The LTV Bank Group, Intervenor–Ap-
pellee, Cross–Appellant.[1]

Nos. 695 and 696, Dockets 88–6244,
88–6246 and 88–6252.

United States Court of Appeals,
Second Circuit.

Argued Jan. 13, 1989.

Decided May 12, 1989.

---

1. The LTV Bank Group filed a Notice of Cross–Appeal from the final judgment of the United States District Court for the Southern District of New York. It did not file a separate brief in support of this cross-appeal, but rather joined in a brief filed on behalf of the LTV Corporation, LTV Steel Company, Inc. and the Official Committee of Unsecured Creditors of the LTV Corporation. Its position appears to be indistinguishable from the other parties' claims. There being no separate brief filed, we consider its cross-appeal to have been abandoned.

Gary M. Ford, Gen. Counsel, Pension Ben. Guar. Corp., Washington, D.C. (Carol Connor Flowe, Deputy Gen. Counsel, Jeanne K. Beck, Asst. Gen. Counsel, James J. Armbruster, Paula J. Connelly, Pension Ben. Guar. Corp., Philip W. Tone, Jenner & Block, E. Calvin Golumbic, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., of counsel), for plaintiff-appellant Pension Benefit Guar. Corp.

R.A. King, Pittsburgh, Pa. (Kenneth R. Bruce, Janet R. Thompson, Buchanan Ingersoll, Pittsburgh, Pa., Stuart Cotton, Mound Cotton & Wollan, New York City, of counsel), for intervenors-appellants David H. Miller and William W. Shaffer.

Lewis B. Kaden, New York City (Karen E. Wagner, Sharon Katz, Joan Greco, Davis Polk & Wardwell, New York City, of counsel), Michael J. Crames, New York City (Herbert S. Edelman, Marc Abrams, Levin & Weintraub & Crames, New York City, of counsel), Frank Cummings, Leboeuf, Lamb, Leiby & MacRae, Washington, D.C., on the brief, for defendants-appellees LTV Corp. and LTV Steel Co., Inc.

Brian Cogan, New York City (Lawrence M. Handelsman, Stroock & Stroock & Lavan, Leonard E.M. Rosen, Theodore Gewertz, Harold Novikoff, Wachtell, Lipton, Rosen & Katz, New York City, of counsel), for intervenor-appellee Official Committee of Unsecured Creditors.

Geoffrey M. Kalmus, New York City (Joel Zweibel, Peter V. Pantaleo, Kramer, Levin, Nessen, Kamin & Frankel, New York City, of counsel), for intervenor-appellee LTV Bank Group.

Claude D. Montgomery, New York City (Edgar H. Booth, Peter D. Wolfson, Sara L. Chenetz, Myerson & Kuhn, New York City, of counsel), for intervenor-appellee Official Committee of Equity Security Holders.

Kathryn C. Mallory, Dallas, Tex. (Robin E. Phelan, Haynes and Boone, Dallas, Tex., of counsel), for intervenor-appellee Banc-Texas Dallas, N.A.

Carl B. Frankel, Paul V. Whitehead, Karin S. Feldman, United Steelworkers of America, Pittsburgh, Pa., Bruce H. Simon, Richard M. Seltzer, Babette A. Ceccotti, Sophia E. Davis, Cohen, Weiss and Simon, New York City, on the brief, for amicus curiae, United Steelworkers of America.

G. Stewart Webb, Jr., William D. Quarles, Warren W. Hamel, Venable, Baetjer, Howard and Civiletti, Washington, D.C., on the brief, for amici curiae, Armco, Bethlehem Steel Corp., Inland Steel Industries, Inc., Nat. Steel Corp. and USX Corp.

Before VAN GRAAFEILAND, MESKILL and MINER, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal from a September 12, 1988 judgment of the United States District Court for the Southern District of New York, Sweet, J., that denied a motion for summary judgment by plaintiff Pension Benefit Guaranty Corporation (PBGC), vacated PBGC's Notice of Restoration of several pension plans that were maintained and administered by defendants The LTV Corporation and LTV Steel Company, Inc. and ordered entry of judgment in favor of LTV. The district court's opinion is reported as *In re Chateaugay Corp.*, 87 B.R. 779 (S.D.N.Y.1988).

We affirm the judgment of the district court and remand the matter to PBGC.

## BACKGROUND

### A. *PBGC and Title IV of ERISA*

The Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461 (1982 & Supp. IV 1986), *as amended by* the Single–Employer Pension Plan Amendments Act of 1986 (SEPPAA), Pub. L. No. 99–272, 100 Stat. 237,[2] governs the maintenance and administration of employee pension plans. PBGC is a wholly owned United States government corporation which serves as a national insurer of pension plans. It was created under ERISA section 4002, 29 U.S.C. § 1302, "(1) to encourage the continuation and maintenance of voluntary private pension plans ..., (2) to provide for the timely and uninterrupted payment of pension benefits to [plan] participants and beneficiaries ..., and (3) to maintain premiums established by the corporation ... at the lowest level consistent with carrying out its obligations."

---

**2.** Certain sections of ERISA relevant to this appeal were further amended by the Pension Protection Act of 1987, Subtitle D of Title IX of the Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, §§ 9301–9346, 101 Stat. 1330, 1330–331–1330–374 (codified as amended at 29 U.S.C.A. §§ 1001–1461 (1985 & West Supp. 1988)). These amendments took effect after the events relevant here, and therefore are inapplicable.

Under ERISA, single-employer pension plans may be voluntarily terminated under certain circumstances by plan administrators under ERISA section 4041, 29 U.S.C. § 1341. They also may be involuntarily terminated by PBGC under ERISA section 4042, 29 U.S.C. § 1342, for various reasons such as the employer's inability to adequately fund the benefit programs. PBGC is required to guarantee payment of nonforfeitable benefits under terminated plans, subject to certain limitations. *See* ERISA sections 4022, 4022B, 4061, 29 U.S.C. §§ 1322, 1322b, 1361. To finance the payment of these benefits, PBGC uses funding obtained from two sources: (1) the annual insurance premiums paid by the administrators of covered plans pursuant to sections 4006 and 4007 of ERISA, 29 U.S.C. §§ 1306, 1307, and (2) the employer liability payments collected under section 4062 of ERISA, 29 U.S.C. § 1362, which makes employers whose plans terminate with insufficient assets liable to PBGC for part of the terminated plan's unfunded guaranteed benefits, *see* 29 U.S.C. § 1362(b).

Section 4047 of ERISA, 29 U.S.C. § 1347, provides for the restoration of plans that have been terminated. Specifically, section 4047 provides, in pertinent part:

> In the case of a plan which has been terminated under section 1341 or 1342 of this title [PBGC] is authorized in any such case in which [PBGC] determines such action to be appropriate and consistent with its duties under this subchapter, to take such action as may be necessary to restore the plan to its pretermination status, including, but not limited to, the transfer to the employer or a plan administrator of control of part or all of the remaining assets and liabilities of the plan.

Whether PBGC properly exercised this restoration authority is the focal point of the instant dispute.

### B. *LTV and Its Financial Difficulty*

The LTV Corporation is a Delaware corporation whose subsidiaries include LTV Steel Company, Inc., which was created by the merger of the Jones & Laughlin Steel Company, Youngstown Sheet & Tube Company and Republic Steel Corporation. LTV Corporation and LTV Steel Company, Inc. will hereinafter be referred to collectively as "LTV." LTV maintained numerous pension benefit plans for its employees, including the three plans that are the subject of the instant dispute, the Jones & Laughlin Hourly Pension Plan (J & L Hourly Plan), the Jones & Laughlin Retirement Plan (J & L Salaried Plan), and the Pension Plan of Republic Steel Corporation Dated and Effective as of March 1, 1950 (Republic Hourly Plan) (collectively "the Plans"). The Plans were subject to the minimum funding standards found in section 302 of ERISA, 29 U.S.C. § 1082, and section 412 of the Internal Revenue Code, 26 U.S.C. § 412 (1982) (amended 1986), both of which required LTV to make contributions to them.

When LTV began experiencing financial difficulty in 1985, it applied for and received from the Internal Revenue Service (IRS) a waiver of its minimum funding requirement for the 1984 plan year pursuant to section 412(d) of the Internal Revenue Code, 26 U.S.C. § 412(d). According to the terms of the waiver, LTV was permitted to amortize over a fifteen year period the 1984 contribution due under the plans. In 1986, LTV, still experiencing financial difficulty, sought waivers of the amount it owed for the 1985 plan year and the amount due under the amortization agreement for the 1984 plan year. In November 1986, the IRS denied the request and revoked LTV's waiver of the 1984 payment obligation, making LTV immediately liable for the contributions for the two years.

On July 17, 1986, LTV and most of its subsidiaries filed petitions for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101–1174 (1982 & Supp. V 1987). On December 16, 1986, LTV sent a letter to PBGC stating that "because LTV is currently in reorganization under Chapter 11 of the Bankruptcy Code, LTV cannot and will not make contributions to the Plans to eliminate the accumulated funding deficiencies arising upon the denial of the funding waivers," and also that "LTV does not intend, and is not

likely to have the ability, to fund the Plans for future years."

### C. *PBGC's Involuntary Termination of the Plans*

On January 12, 1987, PBGC brought an action under section 4042 of ERISA, 29 U.S.C. § 1342, to terminate the Plans and to be appointed statutory trustee. LTV agreed to the terminations and the United States District Court for the Southern District of New York, Owen, *J.*, entered consent orders terminating the Plans as of January 13, 1987. The United Steelworkers of America (the Union) filed an unsuccessful motion to vacate the consent orders. We affirmed the district court's order denying that motion. *Jones & Laughlin Hourly Pension Plan v. LTV Corp.*, 824 F.2d 197 (2d Cir.1987). Pursuant to the consent orders and the guarantee found in ERISA section 4022, 29 U.S.C. § 1322, PBGC became liable for funding the payment of the non-forfeitable benefits under the Plans. Payment of benefits was reduced to the extent they were not guaranteed by PBGC. Benefits not guaranteed by PBGC, such as certain early retirement, disability and surviving spouse benefits were lost completely as a result of the termination.

### D. *The Union Lawsuit and the 1987 Collective Bargaining Agreement*

The Union is the representative of LTV's nonmanagement employees. The Union brought suit in bankruptcy court alleging that LTV's failure to provide the full range of benefits specified under the Plans amounted to a breach of the existing collective bargaining agreement between the Union and LTV and was a violation of section 1113 of the Bankruptcy Code, 11 U.S.C. § 1113 (which allows rejection of collective bargaining agreements by debtors-in-possession in bankruptcy only under certain circumstances). Fearing that the Union would strike to obtain payment of the non-guaranteed benefits and hoping to settle the lawsuit, LTV sought and obtained approval from the bankruptcy court to make a single hardship payment to each retiree.

The Union and LTV subsequently entered into negotiations that resulted in a new collective bargaining agreement (the 1987 CBA). The 1987 CBA, which settled the Union's suit against LTV, is an interim agreement that is to remain in effect until confirmation of a plan of reorganization. Under the 1987 CBA, some of the benefits that employees had enjoyed under the previous collective bargaining agreement were reinstated with modifications, and several new benefit programs were included. These modified and new plans will be referred to as either the "new Plans" or the "1987 CBA Plans." PBGC contends that the 1987 CBA Plans were "follow-ons" or merely continuations of the Plans, and allowed LTV to provide a high level of benefits to its employees while a substantial portion of the cost of the programs was paid by PBGC. The bankruptcy court approved the 1987 CBA, pursuant to an exercise of its powers under 28 U.S.C. § 157(b) (1982 & Supp. IV 1986) and section 105 of the Bankruptcy Code, 11 U.S.C. § 105. PBGC strongly objected to the bankruptcy court's approval.

### E. *Restoration of the Plans*

On August 12, 1987, the SEPPAA Trusteeship Working Group (the Working Group), a PBGC committee established to advise PBGC, unanimously recommended restoration of the Plans to avoid abuse of the pension termination insurance program. The recommendation was based on:

a. LTV's establishment of abusive follow-on plans which, together with the PBGC's guarantee, provide substantially the same benefits as the terminated plans and restore amounts in excess of PBGC's guarantee limitations;

b. the improvement in LTV's financial condition; and

c. LTV's demonstrated willingness to fund employee retirement plans.

According to the minutes of the August 6, 1987 meeting held to consider restoration, the Working Group "discussed the purposes of Title IV of ERISA, PBGC's duties and obligations under Title IV and SEP-

PAA's Declaration of Policy" before reaching its recommendation.

The Working Group's recommendation was reviewed by the Executive Director of PBGC who concurred in the reasoning and the result. On September 22, 1987, PBGC issued a Notice of Restoration stating that pursuant to ERISA section 4047, 29 U.S.C. § 1347, it was appropriate for PBGC to restore full liability for the Plans to LTV. Restoration was effective as of January 13, 1987.

### F. District Court Proceedings

When LTV refused to comply with the Notice of Restoration, PBGC brought an enforcement action in district court. David H. Miller and William W. Shaffer, former salaried employees of LTV companies who were entitled to benefits pursuant to the J & L Salaried Plan, intervened individually and on behalf of others seeking to have the Notice of Restoration enforced at least with respect to the J & L Salaried Plan. The Official Committee of Unsecured Creditors of LTV Corporation, the Subcommittee of Parent Creditors of the Official Committee of Unsecured Creditors of LTV Corporation, the LTV Bank Group, the Official Committee of Equity Security Holders, Banc–Texas Dallas, N.A., the Fifth Third Bank, Huntington National Bank and Citibank, N.A. all intervened seeking to have PBGC's restoration decision vacated. PBGC subsequently moved for summary judgment on all of its claims. The district court denied the motion and found that the bases for the restoration decision were not supported by the administrative record, that PBGC's conclusion was reached in an arbitrary and capricious manner, that PBGC's procedures were inadequate and that the appropriate remedy was to vacate the Notice of Restoration and remand the matter to PBGC. This appeal followed. For the following reasons, we agree with the district court's disposition of this case.

## DISCUSSION

### A. Jurisdiction

In rendering its judgment, the district court stated that it "determined pursuant to Rule 54(b) of the Federal Rules of Civil Procedure that there is no just reason for delay" and went on to deny PBGC's motion for summary judgment, vacate PBGC's Notice of Restoration and direct entry of judgment in favor of LTV. Intervenor-appellee BancTexas Dallas, N.A. contends that the Rule 54(b) certification was improvidently granted and thus we lack appellate jurisdiction because there was no final judgment capable of being appealed.

■■■■ The grant of Rule 54(b) certification is reviewable on appeal under an abuse of discretion standard. If the district court abused its discretion in issuing the certification, we lack jurisdiction over this appeal. *Burr by Burr v. Ambach*, 863 F.2d 1071, 1074 (2d Cir.1988) (citing *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 437, 76 S.Ct. 895, 900, 100 L.Ed. 1297 (1956), *Brunswick Corp. v. Sheridan*, 582 F.2d 175, 183 (2d Cir.1978)). The district court did not strictly comply with the requirements for the issuance of a Rule 54(b) certification in this case. Nevertheless, we conclude that we do have appellate jurisdiction to adjudicate the merits of this case.

Rule 54(b) states, in pertinent part:
When more than one claim for relief is presented in an action, whether as a claim, counterclaim, crossclaim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

Unquestionably, there are several claims and multiple parties involved in the instant dispute. At issue here is whether all of the claims were specifically addressed by the district court, and, if not, whether the Rule 54(b) certification was properly granted.

BancTexas claims that the district court did not adjudicate all of the claims of intervenors-appellants Miller and Shaffer or of intervenor-appellee the Official Committee of Equity Security Holders (Equity Committee). Specifically, BancTexas argues

that the district court neglected to address Miller's and Shaffer's request "that the Court decree that the J & L Plan is to pay full promised plan benefits with interest to each retired participant, both retroactively to January 13, 1987 and in the future as those benefit payments come due from the assets of the J & L Plan." BancTexas also contends that the district court failed to address the Equity Committee's request that the court enter judgment:

(1) On the First Claim against LTV and LTV Steel, declaring the consents of LTV and LTV Steel to the Terminations to have been unnecessary and in violation of Section 363 of the Bankruptcy Code (which regulates the trustee's use, sale or lease of property of an entity in bankruptcy and the rights of third parties that have an interest in that property) and Bankruptcy Rule 9019 (which concerns compromise and arbitration of controversies affecting the bankruptcy estate); and requiring LTV and LTV Steel to consent to and comply with the Restorations on economically viable terms;

(2) On the Second Claim against LTV and LTV Steel and Cross–Claim against PBGC, declaring pursuant to 28 U.S.C. Sections 2201 and 2202, 11 U.S.C. Section 105 and 29 U.S.C. Section 1347 that the PBGC has the power and authority to restore the Plans; that such restoration must be on terms and conditions that are economically viable, in a manner not inconsistent with ERISA and not contrary to the provisions of the Bankruptcy Code; ... and

(3) On the Third Claim against LTV Steel, declaring that if assets or securities of any Debtor other than LTV Steel are to be used to satisfy any claims in the Debtors' jointly-administered reorganization cases caused by or arising from the Terminations, such Debtors shall have claims against LTV Steel for the full value of any of its assets or securities used to satisfy such a claim.

In effect, Miller's and Shaffer's complaint sought the enforcement of PBGC's reinstatement decision. The district court's decision vacating the Notice of Restoration thus resolved Miller's and Shaffer's claims. As Miller's and Shaffer's claims were effectively disposed of by the district court's decision, they are not properly the subject of an inquiry into the propriety of a Rule 54(b) certification.

The second of the three claims of the Equity Committee was directly addressed by the district court, which held that PBGC did have the authority to restore the Plans and that restoration must take into account the policies and goals of ERISA as well as those of bankruptcy and labor law. The first and third claims, however, were not directly addressed. As there were claims left unresolved, the appropriateness of a Rule 54(b) certification was properly raised.

In issuing a Rule 54(b) certification, a district court cannot merely announce that "there is no just reason for delay." " 'Rather, its certification must be accompanied by a reasoned, even if brief, explanation of its conclusion.' " *National Bank of Washington v. Dolgov,* 853 F.2d 57, 58 (2d Cir.1988) (per curiam) (quoting *Cullen v. Margiotta,* 811 F.2d 698, 711 (2d Cir.), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987)). Here, in entering its judgment, the district court flatly stated that "there is no just reason for delay," without offering any explanation for its conclusion. Thus, it might appear that the Rule 54(b) certificate was defective, depriving us of appellate jurisdiction.

However, when reviewing the granting of a Rule 54(b) certificate "the standard against which a district court's exercise of discretion is to be judged is the 'interest of sound judicial administration.' " *Curtiss–Wright Corp. v. General Electric Co.,* 446 U.S. 1, 10, 100 S.Ct. 1460, 1466, 64 L.Ed.2d 1 (1980) (quoting *Mackey,* 351 U.S. at 437, 76 S.Ct. at 900); *see Perez v. Ortiz,* 849 F.2d 793, 796 (2d Cir.1988). In a similar vein, we have held that where the question of whether a Rule 54(b) certificate was improvidently granted is a close one, we may decline to dismiss the appeal "chiefly because we believe that our disposition of the appeal ... will make possible a more expeditious and just result for all parties." *Gumer v. Shearson, Hammill & Co.,* 516

F.2d 283, 286 (2d Cir.1974). In the instant case, it is more judicially efficient for us to exercise jurisdiction and reach the merits of the dispute now rather than cause a delay by demanding strict technical compliance with the certification requirement. While the district court did not provide a reasoned explanation, it is clear that if we were to decline to exercise jurisdiction and demand such an explanation, one could easily be provided, citing such factors as the multiplicity of parties involved, the importance of the central issue and judicial economy. The interest of sound judicial administration favors an expeditious resolution of the conflict presented here. *See Perez,* 849 F.2d at 796–97. We therefore hold that the district court did not abuse its discretion in granting the certification and we proceed to address the merits.

B. *The Merits*

Under Fed.R.Civ.P. 56(c), a motion for summary judgment should be granted only "when, viewing the record in the light most favorable to the nonmoving party, the evidence offered demonstrates that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law." *Cinema North Corp. v. Plaza at Latham Associates,* 867 F.2d 135, 138 (2d Cir.1989) (citation omitted). As there were several material facts in dispute in the present case, the district court correctly denied the motion for summary judgment and undertook a review of PBGC's restoration decision.

PBGC is an administrative agency subject to the provisions of the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.* (1982 & Supp. IV 1986), and its decisions are reviewable under the arbitrary and capricious standard found in 5 U.S.C. § 706(2)(A). Our inquiry into whether PBGC's decision was arbitrary and capricious must be based on the record that PBGC presented to the district court. *See Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1606–07, 84 L.Ed.2d 643 (1985); *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed. 2d 106 (1973); *Citizens to Preserve Over-*

*ton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). When reviewing an agency's decision, courts must determine whether the agency took all relevant factors into consideration in arriving at the decision. *See Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823; *Sierra Club v. United States Army Corps of Engineers,* 772 F.2d 1043, 1051 (2d Cir. 1985); *New York Council, Ass'n of Civilian Technicians v. Federal Labor Relations Authority,* 757 F.2d 502, 508 (2d Cir.), *cert. denied,* 474 U.S. 846, 106 S.Ct. 137, 88 L.Ed.2d 113 (1985). Because ERISA, bankruptcy and labor law are involved in the case at hand, there must be a showing on the administrative record that PBGC, before reaching its decision, considered all of these areas of the law, and, to the extent possible, honored the policies underlying them.

"One of Congress' central purposes in enacting [ERISA] was to prevent the 'great personal tragedy' suffered by employees whose vested benefits are not paid when pension plans are terminated." *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 446 U.S. 359, 374, 100 S.Ct. 1723, 1733, 64 L.Ed.2d 354 (1980) (quoting Senator Bentsen, 3 *Legislative History of the Employee Retirement Income Security Act of 1974,* 94th Cong., 2nd Sess. 12 (Comm.Print 1976)). Accordingly, PBGC was created to encourage the maintenance of voluntary private pension plans, ensure the uninterrupted payment of pension benefits and maintain the premiums established by PBGC at the lowest possible level. ERISA section 4002, 29 U.S.C. § 1302; *see Belland v. Pension Benefit Guaranty Corp.,* 726 F.2d 839, 843 & n. 4 (D.C.Cir.), *cert. denied,* 469 U.S. 880, 105 S.Ct. 245, 83 L.Ed.2d 183 (1984).

The purpose of a Chapter 11 reorganization under the Bankruptcy Code "is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders." H.R.Rep. No. 595, 95th Cong., 2nd Sess. 220, *reprinted in* 1978 U.S.Code Cong. & Admin.News pp. 5787, 5963, 6179. Debtors in reorganization receive an automatic stay

under section 362 of the Bankruptcy Code, 11 U.S.C. § 362, which prevents the recovery of any claim against the debtor that arose prior to the commencement of the bankruptcy case. Thus the results of a reorganization are the shielding of a debtor from the financial pressures imposed by its creditors, and the promotion of the equitable distribution of the debtor's assets to its creditors. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203, 103 S.Ct. 2309, 2312, 76 L.Ed.2d 515 (1983).

"A fundamental aim of the National Labor Relations Act is the establishment and maintenance of industrial peace to preserve the flow of interstate commerce. Central to achievement of this purpose is the promotion of collective bargaining as a method of defusing and channeling conflict between labor and management." *First Nat'l Maintenance Corp. v. NLRB*, 452 U.S. 666, 674, 101 S.Ct. 2573, 2578, 69 L.Ed. 2d 318 (1981) (citation omitted).

Although this case arose under ERISA, the competing policies of bankruptcy and labor law must also be accorded due weight. In fact, section 514(d) of ERISA, 29 U.S.C. § 1144(d), explicitly states that "[n]othing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States (except as provided in sections 1031 and 1137(c) of this title) or any rule or regulation issued under any such law." *See also National Stabilization Agreement of the Sheet Metal Indus. Trust Fund v. Commercial Roofing & Sheet Metal*, 655 F.2d 1218, 1223 (D.C.Cir.1981), *cert. denied*, 455 U.S. 909, 102 S.Ct. 1256, 71 L.Ed.2d 447 (1982). Thus, here the policies and goals of ERISA must be accommodated along with those of bankruptcy and labor law.

These bodies of law have been harmonized in several instances. Section 1113 of the Bankruptcy Code, 11 U.S.C. § 1113, is meant to encourage collective bargaining. *In re Century Brass Prods., Inc.*, 795 F.2d 265, 273 (2d Cir.), *cert. denied*, 479 U.S. 949, 107 S.Ct. 433, 93 L.Ed.2d 383 (1986).

Included as subjects of mandatory bargaining under section 1113 are retiree benefits and pension and insurance benefits for active employees. *See id.* at 274–75 (discussing *Allied Chem. & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971)). Thus section 1113 of the Bankruptcy Code reflects labor law concerns. In 1986, we affirmed a district court decision that specifically stated "[t]he Bankruptcy Code and ERISA must be interpreted together." *In re Baptist Medical Center of New York, Inc.*, 52 B.R. 417, 419 (E.D.N.Y.1985), *aff'd*, 781 F.2d 973 (2d Cir.1986) (per curiam). Hence, each of these areas of law is to be interpreted in light of the policies and goals of the other two.

In the instant case, a review of the administrative record fails to satisfy us that PBGC adequately considered the policies and goals of the bodies of law involved in this case and their interaction with each other. Rather, PBGC focused inordinately on ERISA. This failure renders PBGC's decision arbitrary and capricious.

Even when we examine the factors upon which PBGC did base its decision, we find no support in the administrative record for the conclusion reached. Thus, the restoration decision is insupportable as a matter of law.

### 1. Follow-on Plans

■ PBGC based its restoration decision partly on its finding that the adoption of the 1987 CBA Plans, while LTV was in Chapter 11 reorganization, constituted an abuse of the termination insurance program. We disagree.

Although ERISA section 4047 states that PBGC may restore terminated plans "in any such case in which [PBGC] determines such action to be appropriate and consistent with its duties under this subchapter," 29 U.S.C. § 1347, this does not lead to the conclusion that PBGC may base a restoration decision on the establishment of follow-ons. As indicated *infra*, the legislative history of section 4047 and the intentions

of ERISA, bankruptcy and labor law belie such an assertion.

The legislative history of section 4047 reveals no indication that Congress intended the establishment of successive benefit plans to be a ground for restoration. Congress' focus in enacting section 4047 was mandating restoration if there was an improvement in financial circumstances. "[A] terminated plan being operated by a trustee as a wasting trust may be restored if, during the period of its operation by the trustee, experience gains or increased funding make it sufficiently solvent." H.R. Conf.Rep. No. 1280, 93rd Cong., 2nd Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News pp. 4639, 5038, 5158. Similarly, the legislative history of SEPPAA bears no indication that Congress considered the establishment of follow-on plans subsequent to an involuntary termination to be a ground for restoration. *See* H.R.Rep. No. 241, 99th Cong., 2nd Sess., pt. 2, at 51–55, *reprinted in* 1986 U.S.Code Cong. & Admin.News pp. 42, 685, 709–13. The legislative history surrounding the most recent enactment of amendments to ERISA, the Pension Protection Act of 1987, Subtitle D of Title IX of the Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, §§ 9301–9346, 101 Stat. 1330, 1330–331–1330–374 (PPA), indicates that Congress considered and rejected the idea of prohibiting the establishment of follow-on plans and making the establishment of such plans a basis for a restoration decision. *See* H.R.Conf.Rep. No. 495, 100th Cong., 1st Sess. 879–85, *reprinted in* 1987 U.S. Code Cong. & Admin.News 2313–1245, 2313–1625 to 2313–1631. Although this amendment governs only terminations occurring after December 17, 1987 and thus is not applicable to the instant case, it reflects the continuing consensus not to include the establishment of follow-ons as a basis for a restoration decision.

Section 1113 of the Bankruptcy Code, 11 U.S.C. § 1113, encourages collective bargaining for debtors in reorganization. That LTV was in reorganization was no reason for pension plans not to be the subject of bargaining. *See Century Brass,* 795 F.2d at 274. LTV, in entering collec-

tive bargaining with the Union, sought to ensure industrial tranquility by averting a strike. The Union was bargaining to ensure that its members received benefits commensurate with what had been promised them. Construing the policies of labor law and bankruptcy law in concert with ERISA's goal of the continued payment of pension benefits, we agree with the district court that the establishment of the 1987 CBA Plans was acceptable.

Not only is there no indication that the establishment of follow-ons is impermissible, but PBGC offers no detailed-comparison of the two sets of plans to support its conclusion that the 1987 CBA Plans were merely continuations of the old Plans. The record reflects only a brief comparison of the two sets of plans in the affidavit of C. David Gustafson, Manager of PBGC's Actuarial Policy Division. This is insufficient to support PBGC's conclusion. While the 1987 CBA Plans did continue many of the benefits that were guaranteed under the Plans, there are several differences in the two sets of plans. For instance, (1) none of the new programs under the 1987 CBA Plans are guaranteed by PBGC; (2) benefits under the new Plans are provided through welfare plans, insurance companies or general corporate assets, whereas benefits under the old Plans were provided under a single defined benefit plan; (3) the 1987 CBA Plans have more restrictive age and service eligibility requirements; and (4) the length of service does not necessarily increase the amount of some benefits under the new Plans. Nowhere in the record is there a showing that PBGC undertook an analysis of these differences.

Collective bargaining agreements can establish a contractual obligation to provide pension benefits, following termination of a plan, in excess of the amounts guaranteed by PBGC. ERISA contains no restriction on the employees' rights to receive benefits not guaranteed under ERISA. *See Murphy v. Heppenstall Co.,* 635 F.2d 233, 237–39 (3d Cir.1980), *cert. denied,* 454 U.S. 1142, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982). From this it follows that the establishment of the 1987 CBA Plans, which contain some

programs which are not guaranteed by PBGC and thus may be regarded as being in excess of the guaranteed benefits, does not violate any provisions of ERISA.

PBGC places substantial reliance on three of its opinion letters which express its policy against follow-on plans and identify factors that may result in the restoration of terminated plans. The district court found that those letters concerned cases that were "too factually dissimilar from the instant case to be of substantial assistance here." We agree.

First, the opinion letters all involve cases of voluntary rather than involuntary terminations. Second, in two of the cases, the proposed new plans specifically contemplated the use of PBGC funds as an integral part of their financing, and would result in the employers conferring benefits to the employees at or greater than the pretermination level. In contrast, here the Plans were involuntarily terminated by PBGC. Additionally, there was no evidence that LTV contemplated the use of PBGC funds in the new Plans or entered into the 1987 CBA Plans in an attempt to assure its employees a high level of benefits while circumventing its obligation to fund the pension plans.

We note that intervenors-appellants Miller and Shaffer, in support of the restoration decision, raise the issue of the salaried employees' relative well being under the terminated Plans and under the follow-on plans. While they concede that they are financially better off under the follow-on plans than they would be under the PBGC guaranteed programs, they still advocate restoring the Plans because of the protections they would enjoy under ERISA. This, however, is not a reason to fault LTV's establishment of the follow-on plans. The Union had no obligation to bargain on behalf of the salaried employees. It acted in the best interest of its constituents in entering the 1987 CBA. The salaried employees benefited in that they too received higher benefits than they would have under the PBGC guaranteed levels. They should not now be heard to complain about the establishment of the follow-on plans.

For the foregoing reasons, the establishment of the follow-on plans cannot justify PBGC's restoration decision.

### 2. Financial Circumstances

■ PBGC points to LTV's improved financial condition, based on an alleged betterment that occurred between January and August of 1987 as one of its reasons for restoration. While improvement in financial circumstances is a basis for restoration, the administrative record does not support PBGC's finding that LTV's financial circumstances had improved substantially enough to justify restoration.

Interestingly, ERISA contains no standard by which to determine whether an employer can afford to resume liability for terminated pension plan programs. PBGC was thus left to its own discretion in assessing the financial well being of LTV. We believe that its assessment was erroneous.

#### a. *Summary Financial Analysis*

PBGC based its finding of LTV's financial ability to fund the Plans on a Summary Financial Analysis (the Analysis) prepared by a PBGC staff member based on information provided by LTV. The Analysis did not "attempt[ ] to project economic or other factors that w[ould] affect LTV in the future." There are several problems with the Analysis, its conclusions and PBGC's resultant decision.

The Analysis estimated that the cost of funding the Plans in 1988, with waivers granted, would be $260 million. According to the Analysis, the cost of supplemental benefits included in the 1987 CBA Plans, $90 million, was to be subtracted from the estimated 1988 cost because the supplemental benefits would be duplicative of benefits found in the restored Plans. Also to be subtracted from this figure was $50 million that was to be saved from job reductions obtained as a result of the 1987 CBA.

After each of the subtractions was made, the Analysis concluded that the cost of the programs in 1988 would be $120 million.

According to the figures before us, LTV Steel's net income for 1987 was estimated at $238.5 million. The projected operating income of LTV Steel for January through May 1987 was $118.8 million, whereas the actual operating income was $163.7 million. Reviewing these data, the Analysis stated that "[b]ased on LTV's own cash flow projections, it appears that the debtor will generate more than enough cash during the immediate future (1987 and 1988) to support the reinstatement of the pension obligation."

This conclusion is problematic. The first problem with PBGC's restoration decision is that it was based partly on the fact that LTV's actual operating income for the first five months of 1987 had surpassed the amounts projected in the 1987–1988 Operating Plan. But, five months is too short a period of time to determine an income trend. A longer period of time should have been used to determine whether the improved financial conditions would have a long-lasting effect on LTV. Additionally, as the district court pointed out, "PBGC's calculation was based on two fundamental, yet unexplained and unexamined assumptions." One assumption was that LTV would be able to obtain IRS waivers of its funding contribution requirements for the years 1984–1986. The Analysis fails to take into account that the IRS had previously denied LTV's waiver request for 1985 and had revoked its waiver for 1984. The record discloses no reason to believe that the IRS, after having denied previous waiver requests, would grant such requests in 1987. Accordingly, if the Plans were to be restored, LTV would immediately become liable for contributions that it owed for the years 1984–1986, thereby seriously impairing its financial ability to fund the Plans.

The other unexplained assumption was that the $50 million savings resulting from job reductions made pursuant to the 1987 CBA would be preserved in subsequent bargaining agreements. The Union made these concessions because it was faced with a choice between receiving none of the nonguaranteed benefits or receiving some of them if it made concessions. If PBGC restores the Plans, the Union will get back all of its benefits automatically. Under these circumstances, the Union will have no incentive to make similar concessions. Thus there is no basis for assuming that the Union will make concessions following restoration of the Plans.

Because these two assumptions are unjustified, the basis for the Analysis' conclusion that LTV could support the reinstatement of the Plans is substantially undermined.

b. *Effect of Chapter 11 Reorganization*

PBGC did not effectively assess the impact that LTV's status as a debtor in Chapter 11 reorganization had on its financial condition. As a Chapter 11 debtor, LTV was able to reschedule some of its debt obligations and in effect free up its cash flow. Hence, looking at LTV's cash flow figures, it might appear that LTV's financial position had improved, when in reality, the apparent improvement was directly linked to its basic financial plight.

A second factor related to LTV's position as a Chapter 11 debtor in reorganization that must be considered is the status of the claim for payment into the pension plans. Pension benefits accrue to employees as a result of their past labor on behalf of the employer. In the instant case, the employees of LTV have given their labor in consideration for receiving pension benefits from LTV. This occurred prior to LTV's bankruptcy filing. Thus, any claims arising out of LTV's obligation to pay into the pension fund plans are pre-petition debts. *See Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 103–04 (2d Cir.1986). Pre-petition debts are satisfied by a fair distribution of the debtor's assets, each creditor receiving a proportionate share of the amount of its claim. Hence, any additional money that LTV has must be distributed fairly among the creditors, with the pension plans receiving no special priority. When all the pre-petition claims of LTV's other creditors are considered, and they receive their fair share of any additional funds, LTV's apparent ability to fund the Plans suffers.

■ The district court concluded that restoration did not implicate the automatic stay provisions of the Bankruptcy Code, but that if it did, restoration would be exempt from the automatic stay under section 362(b)(4) of the Code, 11 U.S.C. § 362(b)(4), as an act to enforce PBGC's regulatory authority in furtherance of the public health and welfare. We are less convinced than the district court that the automatic stay provisions are not implicated. However, we need not decide this question for we agree with the district court's alternative theory that restoration is exempt from the automatic stay. This holding is consistent with Congress' purpose in enacting ERISA—protecting the public welfare and the "continued well-being and security of millions of employees" who participate in pension plans. 29 U.S.C. § 1001(a).

### c. PBGC's Focus on Short Term Factors

A major problem with PBGC's analysis of LTV's financial circumstances is that it focuses principally on factors that relate to LTV's short term economic condition. While LTV may have been able to fund the Plans for a limited period of time because of the improvement in its financial circumstances, the administrative record included no information addressed to the long term ability of LTV to fund the Plans.

ERISA is concerned with the promulgation and maintenance of plans that are viable in the long term as opposed to those that are uncertain or "pay-as-you-go." See 29 U.S.C. § 1002(31). Likewise, section 1.401–1(b)(2) of the IRS Regulations, 26 C.F.R. § 1.401–1(b)(2) (1988), which pertains to deferred compensation and compliance with which is required for PBGC insurance, see 29 U.S.C. § 1321(a), states that "[t]he term 'plan' implies a permanent as distinguished from a temporary program." Here, if the restored plans were viable only for a short period of time, they might in the near future once again have to be re-terminated, thereby defeating the purposes and objectives of ERISA and the tax laws.

We note that nowhere in the administrative record is there any evidence that PBGC assessed the possibility that the Plans would have to be re-terminated. ERISA contains no special provisions governing re-termination; however, the standards would be the same as for an initial termination. If in the near future LTV were once again found unable to adequately fund the Plans, the resulting vacillation in agency policy would lead to uncertainties on the part of the retirees, plan sponsors, creditors and the government. Such uncertainty is to be avoided where possible. See New York Council, Ass'n of Civilian Technicians, 757 F.2d at 508.

In sum, the administrative record does not support PBGC's conclusion that LTV could afford to fund the pension plans. In contrast to sound administrative agency decisionmaking, in reaching its determination of LTV's financial viability, PBGC placed undue reliance on some factors and not enough on others.

### 3. Willingness

The third articulated basis for PBGC's decision was LTV's demonstrated willingness to fund pension plans. On appeal, PBGC contends that this rather amorphous factor is "subsumed in the other two" and therefore need not be addressed separately. We agree and thus decline to discuss it further.

In summary, we are left with the conclusion that PBGC's restoration decision was arbitrary and capricious. See Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

### 4. PBGC's Procedural Approach

■ Section 4047 of ERISA, 29 U.S.C. § 1347, does not discuss the procedures that are to be followed by PBGC when reaching a restoration decision. However, when assessing an agency's actions under the arbitrary and capricious standard, it is a principle of fundamental fairness that

[a] party is entitled ... to know the issues on which decision will turn and to be apprised of the factual material on

which the agency relies for decision so that [it] may rebut it. Indeed, the Due Process Clause forbids an agency to use evidence in a way that forecloses an opportunity to offer a contrary presentation.

*Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 288 n. 4, 95 S.Ct. 438, 442 n. 4, 42 L.Ed.2d 447 (1974). Consistent with this view, we have previously held that an agency must "proceed[ ] in accordance with 'ascertainable standards,' and provide[ ] a statement showing its reasoning when applying the standards." *Patchogue Nursing Center v. Bowen*, 797 F.2d 1137, 1143 (2d Cir.1986) (quoting *Holmes v. New York City Housing Authority*, 398 F.2d 262, 265 (2d Cir. 1968)), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 873, 93 L.Ed.2d 828 (1987). In the instant case, PBGC neither apprised LTV of the material on which it was to base its decision, gave LTV an adequate opportunity to offer contrary evidence, proceeded in accordance with ascertainable standards by which to evaluate when a plan sponsor's financial condition has so improved as to warrant restoration, nor provided a statement showing its reasoning in applying those standards. Failure to do any of these things renders the decision arbitrary and capricious.

## CONCLUSION

On remand, PBGC may be able to justify its decision. However, based on the administrative record presented to the district court and to us, its decision cannot be upheld. Because PBGC's decision was not sustainable on the administrative record, the district court provided the appropriate remedy by vacating PBGC's Restoration Notice and remanding the matter to PBGC. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 549, 98 S.Ct. 1197, 1214, 55 L.Ed.2d 460 (1978); *Camp v. Pitts*, 411 U.S. at 143, 93 S.Ct. at 1244. On remand, PBGC should consider all of the issues, including those raised by the Equity Committee that previously were left unresolved.

Affirmed.