**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Plaintiff,**

**v.**

**PEPSICO, INC., Defendant–Appellant.**

**PEPSICO, INC., Third–Party Plaintiff–Appellant,**

**v.**

**BANNER INDUSTRIES, INC., Third–Party Defendant–Appellee.**

**No. 1318, Docket 89–7110.**

United States Court of Appeals, Second Circuit.

Argued May 24, 1989.

Decided Sept. 8, 1989.

See also, Bkrtcy., 100 B.R. 950.

Arthur S. Friedman, New York City (Laurie S. Josephs, Friedman, Wang & Bleiberg, New York City, of counsel), for appellant.

Thomas D. Yannucci, Washington, D.C. (Frederick M. Rowe, Michael E. Baumann, Joyce L. Bernstein, Kirkland & Ellis, Washington, D.C., of counsel), for appellee.

Before VAN GRAAFEILAND, MESKILL and WINTER, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal from a judgment entered in the United States District Court for the Southern District of New York, Duffy, J., pursuant to Fed.R.Civ.P. 54(b) dismissing defendant-third-party plaintiff-appellant PepsiCo, Inc.'s (PepsiCo) third-party complaint against third-party defendant-appellee Banner Industries, Inc. (Banner). PepsiCo's complaint sought damages for losses it suffered when it became liable on bonds it guaranteed as a surety on behalf of its wholly owned subsidiary, Lee Way Motor Freight, Inc. (Lee Way). These bonds were drawn in favor of plaintiff St. Paul Fire and Marine Insurance Co. (St. Paul); their value exceeded $1 million.

PepsiCo alleges that when Banner's partially owned subsidiary, Commercial Lovelace Motor Freight, Inc. (CL), bought Lee Way from PepsiCo in 1984, Banner caused CL to sell off Lee Way's assets to pay debts CL owed to Banner. According to PepsiCo, if Banner had not caused CL to pay its debts to Banner in this fashion, Lee Way would have retained sufficient assets to pay its own debts, and PepsiCo would not have become liable on the guarantee it had executed in St. Paul's favor.

When Lee Way defaulted on its obligations, St. Paul sued PepsiCo for the money due on the bonds. PepsiCo answered the complaint and denied liability. It also filed a third-party complaint asserting two causes of action against Banner: that Banner was CL's alter ego, and therefore is accountable for CL's misdeeds and that Banner caused PepsiCo's loss "in whole or material part by the wrongful diversion of Lee Way assets," and therefore is accountable for its own improper conduct. The district court granted summary judgment for Banner and dismissed the third-party complaint. PepsiCo appeals from this decision.

We affirm the dismissal by the district court, but we do so on a jurisdictional basis without reaching the merits.

## BACKGROUND

During the time that PepsiCo owned Lee Way, Lee Way and St. Paul executed many bonds. These bonds covered such areas of potential liability for Lee Way as workers' compensation claims and claims for state licensing and regulatory fees and taxes. In the event that Lee Way defaulted on any of the obligations guaranteed by a St. Paul bond, however, PepsiCo had agreed to indemnify St. Paul "from all loss and expense ... incurred by [St. Paul] by reason of having executed any bond" for Lee Way. The indemnity agreement included a provision that "under no circumstances will termination or cancellation of [a] bond relieve [PepsiCo] of its obligation to indemnify [St. Paul]."

In 1984, PepsiCo sold the financially ailing Lee Way to CL. Lee Way had pre-tax losses of over $23 million in 1983; in the offering memorandum distributed by PepsiCo to CL, Alex. Brown & Sons, an investment advisor, described Lee Way as "a likely candidate for a leveraged buyout." In the course of negotiations surrounding the sale of Lee Way to CL, PepsiCo alleges it made an issue of CL's ability to continue to operate Lee Way, and required that any purchaser of Lee Way operate Lee Way in such a way that Lee Way could pay its debts, including those debts for which St. Paul had issued bonds. According to PepsiCo, its pre-sale investigation of CL indicated that CL was a company with a "positive net worth." Furthermore, CL represented that it could restore Lee Way to

profitability; however, as CL noted in its proposed business plan, a document discussing implementation of the sale, CL intended to finance its purchase of Lee Way through "the transfer and/or sale of assets."

PepsiCo apparently was content to rely on CL's assertions that it would restore Lee Way to profitability, as it did not insist that CL agree to pay PepsiCo for any liability resulting from the St. Paul indemnity agreement. Under the terms of the indemnity agreement, PepsiCo would remain liable for claims based on acts that occurred before the sale of Lee Way. In fact, as PepsiCo admits, even if the bonds had been cancelled as of the day of the sale, PepsiCo "would *still* be liable for Lee Way's failure, *after the sale*, to pay for those workers['] compensation claims that had accrued before the sale." Nevertheless, although PepsiCo "had CL contractually agree to use CL's best efforts to replace PepsiCo on its guarantees ... and ... cause[d] St. Paul to cancel its bonds," it did not extract a promise from CL that PepsiCo's own liability would be limited. CL was under no obligation to PepsiCo to hold it harmless from the indemnity agreement.

The sale to CL went through based on PepsiCo's understanding that CL was a financially viable operation, and that even though it was not profitable at the time of the sale, its management was capable of operating Lee Way and CL together in a commercially feasible manner.

The injury from which PepsiCo alleges it suffers was avowedly a result of the concealment from PepsiCo of Banner's true relation to CL, which PepsiCo contends was one of financial domination and managerial control. PepsiCo insists that it had no knowledge at the time it sold Lee Way to CL of this relationship. As to Banner's financial relation to CL, it was clear that at the time of the sale Banner was both a debtor and a substantial creditor of CL. The financial arrangements between the two companies included a tax-sharing agreement. PepsiCo urges, however, that the receivables on CL's books that were owed to it by Banner were debts that Banner had either refused to pay or for which "there was not even a claimed assurance of realizability." Upon examination of a balance sheet for CL, which was certified for CL by Arthur Andersen & Co., one of PepsiCo's expert witnesses testified that he did not think that realization by CL of the money it was owed was "assured beyond reasonable doubt.... I have seen nothing which would permit me to state unequivocally that Banner has guaranteed payment of the tax effect of the CL[ ] losses."

PepsiCo alleges that the operational relationship between CL and Banner was, in fact, one of complete domination and control of CL by Banner. Although Banner had entered an Employee Stock Ownership Plan (ESOP) in March 1983, which reduced its holding in CL from 100 percent to 49.99 percent, and later further reduced its holdings by ten percent, Banner, in PepsiCo's view, retained control of CL through domination of CL's board of directors, manipulation of CL's officers, undercapitalization of CL and the consequent dependence of CL on Banner for financial support. PepsiCo contends that, through Banner's influence and domination of CL, Banner caused CL to "plunder[ ]" Lee Way, stripping it of assets. The revenue from the sale of these assets was then allegedly used to settle CL's debts to Banner. When CL could no longer afford to operate Lee Way as a going concern because of the alleged asset-stripping carried on by CL, Lee Way defaulted on its obligations under the St. Paul bonds. If CL had not complied with Banner's ambitions and stripped Lee Way of its assets, then, PepsiCo alleges, Lee Way would not have defaulted on its obligations under the St. Paul bonds. Thus, PepsiCo argues that Banner is responsible for its injury both because of its direct acts and its control of CL.

After CL's alleged plunder of Lee Way, in February 1985, CL merged with Lee Way to form a company known as Lee Way Holding Co. This was reputedly done so that the assets of both companies could be pooled to pay the liabilities of both. PepsiCo alleges that this act in itself harmed it because all of CL's assets were subject to liens, while none of Lee Way's were.

Thus, the merger resulted in Lee Way's assets being easily available for the payment of debts for which CL's own liened assets were unavailable. Furthermore, at the time of the merger, CL owed Lee Way almost $7 million. This debt was wiped out in the merger. A week after the merger took place, Lee Way Holding Co. filed for protection from its creditors under Chapter 11 of the Bankruptcy Code. *See In re Lee Way Holding Co.*, No. 2–85–00661 (Bkrtcy. S.D.Ohio).

Two weeks after the merger of CL and Lee Way, St. Paul instituted this action in the Southern District of New York seeking payment from PepsiCo of its debt under the indemnity agreement. PepsiCo impleaded Banner as a third-party defendant in St. Paul's action, alleging that Banner's domination of CL and its actions in causing CL to strip Lee Way of its assets were the cause of PepsiCo's liability. Specifically, PepsiCo stated two causes of action against Banner: that "third-party defendant Banner used CL and CL used Lee Way as alter egos, ... without due regard for the separate corporate existences of CL and Lee Way, by reason whereof the corporate veils of CL and Lee Way should be pierced and Banner ... should be required to indemnify and pay over to PepsiCo the amount of any liability herein," and that any liability of PepsiCo to St. Paul "will have been caused ... by the third-party defendant Banner, and the third-party defendant should be required to indemnify and pay over to PepsiCo the amount of any adjudged liability herein." PepsiCo initially denied liability to St. Paul, but has since entered into an "interim arrangement" whereby it has agreed to pay St. Paul "for all loss and expense reasonably and in good faith incurred by St. Paul in administering, defending and/or settling" claims arising out of Lee Way's default on the bonds. Four months after filing its third-party complaint against Banner, PepsiCo filed a claim as an unsecured creditor in Lee Way Holding Co.'s bankruptcy proceeding.

St. Paul and Banner both moved for summary judgment in the instant action. The district court did not rule on St. Paul's motion, finding it moot in light of the interim arrangement. It granted Banner's motion as to both counts of PepsiCo's complaint, however, on the ground that "PepsiCo ha[d] not established wrongdoing by Banner sufficient to disregard corporate separateness and cannot be permitted to shift to Banner the losses suffered by virtue of its status [as] a guarantor of Lee Way debts." PepsiCo thereafter filed a motion requesting the entry of judgment pursuant to Fed.R.Civ.P. 54(b), which the district court granted. PepsiCo thereafter filed a notice of appeal from this judgment.

On appeal, PepsiCo argues that the district court's decision had the effect of ruling that Banner was not liable because PepsiCo had not sought an agreement from Banner that Banner would pay any debts to St. Paul that Lee Way was not able to pay. Specifically, PepsiCo urges that the district court misconstrued the law as it applies to alter ego liability, that the district court did not adequately consider the record presented to it, that the district court should not have ruled against PepsiCo on the ground that PepsiCo "theoretically could have avoided the harm," and that the district court should have made findings of fact with respect to the dismissal of PepsiCo's second cause of action.

## DISCUSSION

### A. *Jurisdiction: Appealability*

In granting PepsiCo's motion for the entry of judgment pursuant to Rule 54(b), the district court gave no reasons for its action. The Federal Rules of Civil Procedure, however, require that

[w]hen more than one claim for relief is presented in an action, ... the court may direct the entry of a final judgment as to one or more but fewer than all of the claims ... only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims ... shall not terminate the action as to any of the claims ... and the

order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

Fed.R.Civ.P. 54(b). In this case, the court merely wrote the words "Motion granted So ordered" and signed the cover of the notice of motion submitted by PepsiCo. It rendered no opinion on the matter and adopted no reasons for the decision.

■ Under the plain terms of Rule 54(b), this writing is not sufficient to constitute the entry of a final determination, and thus we would not have appellate jurisdiction over this case. *See, e.g., Pension Benefit Guaranty Corp. v. LTV Corp.*, 875 F.2d 1008, 1013 (2d Cir.1989); *National Bank v. Dolgov*, 853 F.2d 57, 58 (2d Cir. 1988) (per curiam); *Haynesworth v. Miller*, 820 F.2d 1245, 1252–53 (D.C.Cir.1987); *Santa Maria v. Owens–Illinois, Inc.*, 808 F.2d 848, 854–56 (1st Cir.1986). However, we have recognized an exception to Rule 54(b)'s requirements "where the question of whether a Rule 54(b) certificate was improvidently granted is a close one, [and therefore] we may decline to dismiss the appeal 'chiefly because we believe that our disposition of the appeal ... will make possible a more expeditious and just result for all parties.' " *Pension Benefit Guaranty Corp.*, 875 F.2d at 1014 (quoting *Gumer v. Shearson, Hammill & Co.*, 516 F.2d 283, 286 (2d Cir.1974)). This exception applies if the record reveals that the district court could "easily" provide acceptable reasons for the entry of judgment and "[t]he interest of sound judicial administration favors an expeditious resolution of the conflict presented." *Id.* 875 F.2d at 1015; *see also National Bank*, 853 F.2d at 58 (district court did not give reasons for certification under Rule 54(b) and reasons for certification were not apparent from limited record before the Court); *Perez v. Ortiz*, 849 F.2d 793, 796–97 (2d Cir.1988) (policies underlying Rule 54(b) best served by exercising jurisdiction over appeal where reasons district court would provide on remand were "obvious").

In this case, we are troubled by the district court's action for two reasons. First, the court's error was not that it used formulaic and conclusory language in granting PepsiCo's motion for the entry of judgment, *see, e.g., National Bank*, 853 F.2d at 58 (criticizing use of conclusory language to fulfill requirements of Rule 54(b)); *Cullen v. Margiotta*, 811 F.2d 698, 711 (2d Cir.) (same), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987). While we have allowed the use of such language in cases where other considerations have militated against dismissing an appeal, *see, e.g., Pension Benefit Guaranty Corp.*, 875 F.2d at 1014–15, in this case the language used cannot be described as even "conclusory." Rather, the district court expressed no independent reasoning to indicate that it had considered the record before it and had determined that certification under Rule 54(b) was appropriate. The only indication we have that the court examined the issue in any manner is the inscription granting certification that appears on the cover of the moving papers.

Second, the interim arrangement cited by the district court as the reason St. Paul's motion for summary judgment was moot is not a final determination of PepsiCo's liability. Had a judgment been entered on St. Paul's claim, the issue currently before us would clearly be of relevance to the determination of liability in this case. However, without a judgment entered against PepsiCo, its obligation is certain only insofar as it continues to abide by the interim arrangement. To this effect, the extent of PepsiCo's liability is unknown, and hence the size of PepsiCo's claim against Banner is undetermined.

As to the first problem, however (the problem of the district court's abbreviated notation granting PepsiCo's motion), we believe that the reasons for the district court's actions are readily apparent from the record presented to us. The third-party claim at issue completely disposes of PepsiCo's entire claim for indemnity. It thus finally determines a distinct and separable part of the suit. There is no just reason for delay, as PepsiCo has already asserted to the district court that it has been making

payments to St. Paul, and thus, it has already paid those funds for which it claims it is entitled to reimbursement.

This latter fact also disposes of the second problem we have identified with the district court's action. St. Paul's complaint against PepsiCo and PepsiCo's complaint against Banner state that PepsiCo's potential liability to St. Paul is $1,020,000, in addition to attorney's fees and costs (although the interim arrangement places no such limitation on the amount of payments PepsiCo is to make to St. Paul). In fact, in an affidavit supporting St. Paul's motion for summary judgment, an attorney for St. Paul stated that PepsiCo had, as of April 27, 1987, paid St. Paul more than $1,600,-000 for loss and expense incurred by St. Paul. In its brief, PepsiCo states that it has paid St. Paul over $2 million as of the date of the district court's decision denying summary judgment to St. Paul. Furthermore, PepsiCo has stated that it is "not disputing its liability for" the $2 million it has paid St. Paul.

■ Because PepsiCo has already paid St. Paul an amount exceeding the amount requested in St. Paul's complaint,[1] and because it is unlikely that St. Paul's reasonable costs and attorney's fees incurred in connection with this matter exceed the difference between the amount paid and the amount of the bond, we will proceed on the premise that St. Paul's demand has become moot, as PepsiCo has given St. Paul everything St. Paul has requested in its complaint.[2] In effect, PepsiCo's liability has been determined by its payments pursuant to the interim arrangement. Thus, resolution of the third-party complaint of PepsiCo against Banner will finally determine an issue in this action that will not be mooted by further proceedings below.

Thus, this purpose of Rule 54(b), the avoidance of unnecessary appeals and the conservation of judicial resources, is served by our exercising jurisdiction. We therefore hold that we have jurisdiction to entertain the instant appeal and that the district court's decision to grant Rule 54(b) certification as it did was not an abuse of discretion.

## B. Jurisdiction: The Effect of the Ohio Bankruptcy Proceeding

### 1. The Allegations in, and Findings of, the Bankruptcy Court

PepsiCo has filed a claim in Lee Way Holding Co.'s bankruptcy proceeding in the United States Bankruptcy Court in the Southern District of Ohio. The claim alleges that PepsiCo is an unsecured creditor of Lee Way Holding Co. and that payment is due to it on the bases, *inter alia,* of breach of contract, contribution, indemnification, reimbursement of guarantees and overdue notes and advances. The bankruptcy trustee and the Official Committee of Unsecured Creditors (together, the bankruptcy plaintiffs) have brought claims against Banner in the bankruptcy court, contending that Banner's actions caused loss to CL, and thus to Lee Way Holding Co. *See Luper v. Banner Industries, Inc. (In re Lee Way Holding Co.),* No. 2–85–00661, — B.R. —— (Bkrtcy.S.D.Ohio June 21, 1989). On June 21, 1989, the bankruptcy court issued an opinion denying a motion brought by Banner to dismiss these claims. *Id.*

In the bankruptcy proceeding, the bankruptcy plaintiffs allege that CL sustained significant losses and was dependent on Banner from 1980 on, that "[a]s a consequence [of this], Banner was determined to

---

**1.** It is not clear why PepsiCo has paid St. Paul more than the amount demanded in St. Paul's complaint. Apparently, however, other bonds exist on which PepsiCo may be liable to St. Paul.

**2.** As a corollary to this, we note that the district court should have dismissed St. Paul's entire complaint as moot, instead of denying its summary judgment motion as moot and placing the matter on the suspense docket of the court. *See Deakins v. Monaghan,* 484 U.S. 193, 108 S.Ct.

523, 528–29, 98 L.Ed.2d 529 (1988); *Clayton v. International Union, United Automobile, Aerospace & Agricultural Implement Workers,* 451 U.S. 679, 692, 101 S.Ct. 2088, 2097, 68 L.Ed.2d 538 (1981) (if an "employee receive[s] the full relief he requested ... his ... action would become moot"); *Martin–Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983) ("[t]he hallmark of a moot case ... is that the relief sought ... is no longer needed").

protect itself against loss or exposure on its contingent liabilities ... that would arise by virtue of Banner's controlling stock ownership if CL were unable to continue its business operations." They further allege that after the March 1983 ESOP was implemented, Banner continued to control CL's board of directors, that as a result of this "the Board of Directors of CL consistently made decisions that inured to the benefit of Banner," that Banner required CL to agree to indemnify it for earlier guarantees it had executed regarding CL's own debt, that this agreement "was an attempt by Banner to ensure that CL would operate its business in a manner designed to protect Banner's interests," and that the tax sharing agreement between Banner and CL was designed to give Banner benefits it otherwise would have lost with the implementation of the ESOP and "purportedly g[ave] the right [to Banner] to offset amounts owed to CL against amounts owed by CL in connection with the Banner Guaranties." While not directly implicating these actions as harmful to Lee Way, it is clear that the bankruptcy plaintiffs are alleging that the same acts identified by PepsiCo as causing harm to Lee Way also caused harm to both the estate and the unsecured creditors, of whom PepsiCo is one.

Banner argued to the bankruptcy court that the bankruptcy plaintiffs did not have standing to assert alter ego claims against it. The court rejected this assertion and determined that both the bankruptcy trustee and the unsecured creditors' committee had standing to assert the alter ego claims against Banner. As to the trustee, the court stated that under Ohio law an alter ego claim may be asserted by a debtor corporation and also that "the trustee stands in the shoes of creditors," and therefore could assert an alter ego claim. As to the creditors' committee, the court held that "[a] creditors' committee ... has the statutory right to intervene in adversary proceedings related to a bankruptcy case." (citing 11 U.S.C. § 1109(b) (1982) and *Official Unsecured Creditors' Comm. v. Michaels (In re Marin Motor Oil, Inc.)*, 689 F.2d 445, 449–57 (3d Cir.1982), *cert. denied,*

459 U.S. 1206, 1207, 103 S.Ct. 1196, 75 L.Ed.2d 440 (1983)). Because the committee asserted that it was acting in cooperation with the trustee, the court allowed it to maintain its status as a co-plaintiff. Furthermore, the court stated that the bankruptcy plaintiffs' allegations "provide[d] sufficient facts upon which relief could be granted under Ohio law."

The court also determined that the bankruptcy plaintiffs' action was a proceeding under its jurisdiction as provided by the Bankruptcy Code, as "[a]ny recovery by the plaintiffs would inure to the benefit of the debtor's estate and the unsecured creditors." The court said that it could not "conclude that recognizing the ability of the plaintiffs to bring an action based on alter-ego would result in a loss of this Court's jurisdiction."

Discussing a related claim, the court noted that the bankruptcy plaintiffs' interest in Banner's assets is contingent on their successful prosecution of their alter ego claims. In this regard, the debtor (Lee Way Holding Co.) also has a contingent interest in the property. Even though Lee Way Holding Co. is not in possession of Banner's assets, should the bankruptcy plaintiffs prevail on their alter ego claim, this property would become property of the estate, insofar as Banner would be liable for CL's obligations. It therefore would be available for distribution to CL's unsecured creditors, including PepsiCo.

Thus, the bankruptcy court has determined that it has jurisdiction over at least some of the same issues that are being litigated in this suit; the difference between the two suits is that in the bankruptcy court any proceeds from the alter ego claims would be available for all of Lee Way Holding Co.'s unsecured creditors whereas in our case any proceeds would be used to satisfy only PepsiCo's claims. Banner does not dispute PepsiCo's assertion that it has standing to assert an alter ego claim, but it does maintain that PepsiCo's second cause of action, based on wrong done by Banner in diverting CL's assets, is a generalized claim that is property of the

bankruptcy estate and thus properly brought only by the bankruptcy trustee.

Banner's concession of PepsiCo's standing to assert the alter ego claim notwithstanding, we must independently examine the standing issue. *See American Motorists Ins. Co. v. United Furnace Co.*, 876 F.2d 293, 298 (2d Cir.1989) (court must examine question of subject matter jurisdiction even if parties fail to raise it); *Barhold v. Rodriguez*, 863 F.2d 233, 234 (2d Cir.1988) (parties cannot consent to finding of standing). The importance of this determination is apparent when the possible effect of our decision is considered. If we hold that PepsiCo has standing, we may reach a decision that will conflict with that of the bankruptcy court in the Southern District of Ohio. Should the bankruptcy court's decision not be appealed, or should it be appealed and affirmed, there is a prospect that inconsistent final judgments could be entered in this dispute. We now examine whether PepsiCo has standing to assert the claims it has presented here.

### 2. The Standing of the Bankruptcy Trustee, the Official Committee of Unsecured Creditors and PepsiCo

#### a. Article III Standing Requirements

■ Constitutional principles of standing require an allegation that the plaintiff sustained a direct injury that can be traced to the defendant's conduct, and relief from this injury must be likely to follow from an adjudication favorable to the plaintiff. *See, e.g., ASARCO Inc. v. Kadish*, — U.S. ——, 109 S.Ct. 2037, 2039, 104 L.Ed.2d 696 (1989); *Allen v. Wright*, 468 U.S. 737, 750–51, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556, *reh'g denied*, 468 U.S. 1250, 105 S.Ct. 51, 82 L.Ed.2d 942 (1984); *Ad Hoc Comm. of Concerned Teachers v. Greenburgh #11 Union Free School Dist.*, 873 F.2d 25, 28–29 (2d Cir.1989). In addition to other requirements, these conditions assure that federal courts adjudicate only live cases and controversies. It is these requirements that concern us in this case.

#### b. The Framing of the Question

The question whether alter ego claims and other claims of creditors against third parties to a bankruptcy proceeding may or should be brought by the trustee in bankruptcy of a debtor corporation has been considered by several circuits, although our circuit has not directly decided the issue. The courts that have considered this issue, however, have reached differing conclusions. *See, e.g., Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271 (7th Cir.1989); *Gibraltar Sav. v. LDBrinkman Corp.*, 860 F.2d 1275 (5th Cir.1988), *cert. denied*, — U.S. ——, 109 S.Ct. 2432, 104 L.Ed.2d 988 (1989); *Williams v. California 1st Bank*, 859 F.2d 664 (9th Cir.1988); *Steyr–Daimler–Puch of America Corp. v. Pappas*, 852 F.2d 132 (4th Cir.1988); *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339 (7th Cir.1987), *cert. denied*, — U.S. ——, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988); *Chicago Florsheim Shoe Store Co. v. Cluett, Peabody & Co.*, 826 F.2d 725 (7th Cir.1987); *S.I. Acquisition, Inc. v. Eastway Delivery Serv. (In re S.I. Acquisition, Inc.)*, 817 F.2d 1142 (5th Cir.1987); *Mixon v. Anderson (In re Ozark Restaurant Equip. Co.)*, 816 F.2d 1222 (8th Cir.), *cert. denied*, 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987); *American Nat'l Bank v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266 (5th Cir. 1983); *Green v. Bate Records, Inc. (In re 10th Avenue Record Distribs., Inc.)*, 97 B.R. 163 (S.D.N.Y.1989); *Fisher, Hecht & Fisher v. D.H. Overmyer Telecasting Co. (In re D.H. Overmyer Telecasting Co.)*, 56 B.R. 657 (Bkrtcy.N.D.Ohio 1986). A study of these cases reveals a variety of approaches to the problem.

The Fifth Circuit, applying Texas law, said that where a plaintiff alleges that an individual should be held liable under state law for an insolvent corporation's debts because the individual stripped the corporation of its assets for the individual's own benefit, the bankruptcy trustee is the proper party to bring the action. *MortgageAmerica*, 714 F.2d at 1277–78. In *MortgageAmerica*, the plaintiff's causes of action were based on the Texas Fraudulent Transfers Act and the common law trust fund, or denuding, doctrine. The court held that both actions were subject to the automatic

stay provision of the Bankruptcy Code, 11 U.S.C. § 362 (1982 & Supp. V 1987), as they were both property of the estate. Specifically, the court recognized that where allegations of asset-stripping leading to bankruptcy are made, "it makes the most sense to consider the debtor as continuing to have a 'legal or equitable interest[ ]' in the property fraudulently transferred." *Id.* at 1275. Furthermore, the court held that a trust fund action, although normally brought by the creditors themselves, did not "belong" to them, and was in fact the property of the corporation under Texas law. *Id.* at 1277.

The Fifth Circuit later stated that the rule of *MortgageAmerica* applied to alter ego actions under Texas law as well. In *S.I. Acquisition*, the plaintiff alleged that a corporate parent-subsidiary arrangement was used "as a cloak to conceal fraud, wrongs, and injustice." 817 F.2d at 1144. The debtor contended that the plaintiff's suit was stayed by section 362, and the Fifth Circuit agreed. The court's analysis hinged on the question whether, under Texas law, an alter ego action was the property of the corporate debtor. Although it found no law directly supporting the proposition that a corporation could bring an action against its own alter ego seeking indemnification for its debts, the court noted that "[t]he doctrine of alter ego does not rest upon a particular creditor's dealings with or reliance on the control entity, nor does the doctrine require a showing of fraud on a particular creditor." *Id.* at 1152. Therefore, it held that a corporation could be a proper plaintiff in an alter ego action against its parent. Because the alter ego claim could be brought by the corporation, the court held that the claim was the corporation's property and therefore properly brought by the trustee.

As additional support for its decision in *S.I. Acquisition* the court noted that the plaintiff's allegations, if proved, would benefit all the creditors, but that the plaintiff there was proceeding alone. Thus, "to allow [the plaintiff's] actions to proceed would undercut the general bankruptcy policy of ensuring that all similarly-situated creditors are treated fairly." *Id.* at 1153.

In other words, if one creditor could bring an alter ego action outside of the bankruptcy court, all creditors could. To prevent a "multi-jurisdictional rush to judgment [and] ... a potential conflict in judgments," *id.* at 1154, potentially resulting in collateral estoppel problems, the court held that alter ego actions against a bankrupt corporation's parent were, under Texas law, stayed by the filing of bankruptcy. *See also Gibraltar Savings*, 860 F.2d at 1285–86 (alter ego claim could be brought outside of bankruptcy court where bankruptcy court gives leave to bring action, objections to standing were raised in district court but no appeal was taken from the district court's rulings, appeal from order lifting bankruptcy stay was voluntarily dismissed, and alleged alter ego itself challenged plaintiff's attempt to pierce corporate veil).

The Seventh Circuit determined that, under the laws of Illinois, Indiana and Wisconsin, alter ego claims that involve a bankrupt corporation must be brought in the bankruptcy court. In a case where a trustee was pursuing alter ego claims in the bankruptcy court, and eleven creditors brought their own action in the district court, the court affirmed the district court's dismissal of the creditors' complaint for lack of standing. Because the trustee "represents not only the rights of the debtor but also the interests of creditors of the debtor," *Koch Refining*, 831 F.2d at 1342, the trustee "has the duty to marshal the debtor's property for the benefit of the estate, and thus the right to sue parties for recovery of all property available under state law," *id.* at 1343. Accordingly, if, under state law, a cause of action belongs to the debtor or if "rights of action [exist] against officers, directors and shareholders of a corporation for breaches of fiduciary duties, which can be enforced by either the corporation directly or the shareholders derivatively before bankruptcy," *id.*, those actions properly are asserted by the bankruptcy trustee.

Noting that alter ego claims often "involve[ ] improper or fraudulent actions by fiduciaries of a corporation," *id.* at 1344, the court proceeded to examine state law to

determine if the alter ego claims in question could be asserted by the creditors. It held that the existence of an alter ego relationship is determined by the circumstances of the case at hand, but that fraud or other injustice is necessary to an alter ego finding. *Id.* at 1345. Furthermore, under the laws of the states involved, "the alter ego theory is an equitable, remedial doctrine that may be asserted by any creditor without regard to the specific nature of his relationship with the corporation and its alleged alter ego." *Id.* Under this version of alter ego law, the court held that the bankruptcy trustee could bring an alter ego cause of action. *Id.* at 1346. While a trustee could choose to abandon a claim, and allow creditors to pursue it independently, where there had been no such election, the creditors did not have standing to assert the cause of action. *Id.* at 1346–50 & n. 9 ("allegations that could be asserted by any creditor could be brought by the trustee ... a single creditor may not maintain an action on his own behalf against a corporation's fiduciaries if that creditor shares in an injury common to all creditors and has personally been injured only in an indirect manner"). However, the court later held that where a creditor has been the direct object of an alter ego's actions, and has suffered an immediate and distinct injury, that creditor may maintain an action outside of the bankruptcy proceedings. *See Ashland Oil,* 875 F.2d at 1280 ("fraudulent taking from the plaintiffs of exceptionally large quantities of fuel" sufficient to give rise to RICO action against alter egos of bankrupt corporation outside of bankruptcy proceeding); *Koch Refining,* 831 F.2d at 1353–54 (plaintiffs had not alleged direct injury from defendants' actions and therefore did not have standing to assert alter ego claim).

The Fourth Circuit has reached a similar conclusion, under Virginia law, finding that an alter ego claim belongs to the corporation and thus is property of the bankruptcy estate and properly asserted by the bankruptcy trustee. *Steyr–Daimler–Puch,* 852 F.2d at 135–36. The court did not reach the question whether the claim is also property of the creditors; it affirmed the district court's dismissal of alter ego claims not brought by the trustee, stating that unless there is "a judicial determination that the trustee in bankruptcy has abandoned the claim," *id.* at 136, individual creditors could not assert an alter ego claim.

In a related context, the Tenth Circuit has likewise recognized that an action alleging preferential transfers by a director of a bankrupt corporation could not be maintained outside the bankruptcy court, because the bankruptcy trustee has the right "to recover damages for misconduct, mismanagement, or neglect of duty by a corporate officer or director." *Delgado Oil Co. v. Torres,* 785 F.2d 857, 860 (10th Cir.1986). The court rejected plaintiff's attempt to plead its cause of action as a "common law action," but specifically noted that "[p]laintiff never argued alter ego or piercing the corporate veil." *Id.* at 861 n. 12. Nevertheless, had the alter ego issue been raised, the court's analysis seemingly would have hinged on state law, as the court stated that because the property allegedly preferentially transferred was the debtor's, the cause of action to recover that property was the bankruptcy estate's. Thus, if an alter ego action belonged to the corporation, the trustee would be the proper party to assert it.

Under Arkansas law, however, the Eighth Circuit has held that an alter ego action is personal to the creditors, and therefore cannot be asserted by a bankruptcy trustee. *Ozark Restaurant,* 816 F.2d at 1225–26. The court found support for this result in *Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), which held that a bankruptcy trustee does not have standing "to assert ... claims of misconduct by an indenture trustee," *id.* at 416–17, 92 S.Ct. at 1679. The court found additional support in the failure of Congress to adopt a proposed provision that would have overruled *Caplin* and given the trustee explicit power to assert creditors' causes of action. *Ozark Restaurant,* 816 F.2d at 1227–28. However, this argument was rejected by the Seventh Circuit in

*Koch Refining*, where the court stated that the failure of Congress to adopt the bill overruling *Caplin* "does not affect a trustee's right to bring a general action on behalf of all creditors rather than a personal one on behalf of only some." 831 F.2d at 1347 n. 11. Unlike the court in *Koch Refining*, the *Ozark Restaurant* Court believed that allowing the bankruptcy trustee to bring an alter ego cause of action would raise "questions as to which creditors were bound" by the trustee's actions, 816 F.2d at 1230; thus, where other courts have found the prospect of multiplicitous actions to be troublesome, the *Ozark Restaurant* Court found just the opposite.

The *Caplin* holding was also the crucial factor in *Williams*, decided by the Ninth Circuit, which held that even where creditors had assigned their causes of action to the bankruptcy trustee, "[t]he Trustee lacked authority to bring suit" on alter ego claims. 859 F.2d at 667.

The Sixth Circuit has not addressed the question of standing to assert alter ego claims, although two lower court decisions have examined the question under Ohio law. The first, *D.H. Overmyer*, found *Caplin* to be controlling, and stated that a "[s]tate court[ ] in ... Ohio ha[s] held that a reorganization trustee lacks standing to assert the claims of creditors against third parties who allegedly aided the bankrupt in diverting its assets." 56 B.R. at 661 (citing *Friedman v. Myers*, 20 Ohio Cir. Dec. 303 (Cuyahoga Cir.1907)). The court held that because "a trustee in bankruptcy ... lacks standing to assert the claims of creditors against third parties who are alleged to bear responsibility for a debtor's losses," *id.* 56 B.R. at 659, the trustee could not bring a claim that deceitful actions by the unsecured creditors' attorney resulted in loss to the debtor. This claim, the court concluded, belonged to the creditors and not to the debtor. However, in *Luper*, the bankruptcy court's decision in the action between Lee Way Holding Co.'s trustee, the unsecured creditors' committee and Banner, the court specifically held that "[i]t would appear ..., under the theories of alter-ego espoused by Ohio law, that a corporation may assert a claim against its principals." The court held that both the trustee, as the representative of the debtor, and the unsecured creditors' committee, as a co-plaintiff, could maintain an alter ego action against Banner. Thus, the bankruptcy courts in Ohio have not decided on a single approach to the instant problem.

While our Circuit has not addressed the specific question whether an alter ego claim may be maintained by the bankruptcy trustee, *see 10th Avenue Record Distribs.*, 97 B.R. at 164, we have examined the question whether a plaintiff can maintain an action against the general partners of a bankrupt partnership outside of the bankruptcy proceedings, *see Teachers Ins. and Annuity Ass'n v. Butler*, 803 F.2d 61 (2d Cir.1986). In *Teachers*, we granted the partnership's motions to stay appeals based on the automatic stay provision of the Bankruptcy Code and denied a similar motion made by the non-bankrupt general partners. As to the partnership's motions, we found that the conditions of the automatic stay provision had been met; however, as to the general partners' motion, we observed that "stays pursuant to § 362(a) are limited to debtors and do not encompass non-bankrupt codefendants." *Id.* at 65. We therefore examined whether the bankruptcy court's inherent equity powers were sufficient to support a stay of proceedings not directly involving the bankrupt. In the situation presented to us there, we held that they did not. We observed that the general partners made their motion to stay the appeal in a "bad faith [effort] ... to escape from the liability imposed by an adverse district court judgment." *Id.* at 66. Additionally, the trustee was not the one who sought the stay of the appeal. Finally, the action in question, which was a breach of contract claim against the partners and the partnership, was a non-core proceeding and as such beyond the jurisdiction of the bankruptcy court. *Id.* (citing *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90–91, 102 S.Ct. 2858, 2881, 73 L.Ed.2d 598 (1982) (Rehnquist, *J.*, concurring)); *see* 28 U.S.C. § 157(b) (Supp. V 1987) (core proceeding).

As to the stay of the appeal granted to the partnership, however, we conditioned the stay on "the requirement that the [Southern District of New York] district court's ... decision and the judgment that followed be given full faith and credit by the [Eastern District of California] bankruptcy court." *Id.* We made this condition to avoid res judicata problems that would occur if the parties attempted to relitigate the district court's decision in the bankruptcy court.

### c. *The Legal Standard*

We agree with those courts that have held that the determination of whether a claim may be brought by a creditor of a bankrupt corporation outside of the bankruptcy proceedings depends on an analysis of state law. Under the Bankruptcy Code, the bankruptcy trustee may bring claims founded, *inter alia,* on the rights of the debtor and on certain rights of the debtor's creditors, *see, e.g.,* 11 U.S.C. §§ 541, 544, 547 (1982 & Supp. V 1987). Whether the rights belong to the debtor or the individual creditors is a question of state law, *see Morton v. National Bank (In re Morton),* 866 F.2d 561, 563 (2d Cir.1989). Thus the answer to the question whether PepsiCo's claims may be asserted by the bankruptcy trustee depends on an analysis of state alter ego and tort law. If the claims asserted by PepsiCo in this action are property of the debtor (Lee Way Holding Co.) under state law and therefore properly brought by the trustee, and if PepsiCo has not alleged a direct injury traceable to Banner, PepsiCo does not have standing to assert those claims outside of the bankruptcy proceeding.

*Caplin* is not controlling. That case involved allegations by debenture holders that an indenture trustee had engaged in misconduct. The company that issued the debentures had gone into bankruptcy, and the bankruptcy trustee attempted to assert the debenture holders' claim against the indenture trustee. The Supreme Court held that when "the nature of Chapter X [reorganization] proceedings, the role of the trustee in reorganization, and the way in which standing to sue on behalf of debenture holders would affect or change that role" were examined, 406 U.S. at 422, 92 S.Ct. at 1682, the result was a determination that the bankruptcy trustee could not bring the action.

*Caplin,* however, is distinguishable from the case at hand. In *Caplin,* the Court highlighted the "elaborate system of controls [that exist] with respect to indenture trustees and reorganization proceedings," *id.* at 428, 92 S.Ct. at 1685, and noted that Congress' decision not to provide for reorganization trustees "to assume the responsibility of suing third parties on behalf of debenture holders," *id.,* indicated that bankruptcy trustees had no such right. In contrast, there is no elaborate congressional scheme to control either alter ego relations or state tort law, the bases of PepsiCo's complaint against Banner. Furthermore, if a cause of action is property of the debtor, the Bankruptcy Code explicitly gives the trustee the right to assert it on behalf of the estate. 11 U.S.C. § 541.

Additionally, the Court noted that should the bankruptcy trustee lose the suit brought against the indenture trustee, "a question would arise as to who was bound by any settlement." *Caplin,* 406 U.S. at 432, 92 S.Ct. at 1687. This problem evaporates when the approach taken by the Seventh Circuit is followed. In *Koch Refining,* the court held that the creditors alleging indirect injury did not have standing to sue outside the bankruptcy court unless the trustee abandoned the claims available to the estate. 831 F.2d at 1346–50 & n. 9; *see Steyr–Daimler–Puch,* 852 F.2d at 136. Hence, no inconsistent verdicts would result as these creditors could not maintain a suit at all. If the trustee is the only one with standing to bring a certain action, because of the generalized nature of the injury, it follows that those who are barred from bringing that same action in an independent proceeding should and will, under bankruptcy law, be bound by the outcome of the trustee's suit.

That this proposition is true is indicated by the legislative history of the Bankruptcy Code. When considering the auto-

matic stay provision, the House Report stated that the stay "provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors." H.R.Rep. No. 595, 95th Cong., 2nd Sess. 340, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6297. It is plain from this passage that Congress intended to protect all creditors by making the trustee the proper person to assert claims against the debtor. This reasoning extends to common claims against the debtor's alter ego or others who have misused the debtor's property in some fashion. If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action. *See Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1107 (2d Cir.1988), *cert. denied,* —— U.S. ——, ——, 109 S.Ct. 1642, 1643, 104 L.Ed.2d 158 (1989); *Cumberland Oil Corp. v. Thropp,* 791 F.2d 1037, 1042–43 (2d Cir.), *cert. denied,* 479 U.S. 950, 107 S.Ct. 436, 93 L.Ed.2d 385 (1986).

Although the claims raised by PepsiCo are not against the debtor but are against a third party, the same reasoning applies. The claims, if proved, would have the effect of bringing the property of the third party into the debtor's estate, and thus would benefit all creditors. It therefore would be illogical to distinguish between this type of claim against a third party and a claim against the debtor. *See id.* (while the same facts alleged in plaintiff's complaint seeking damages due to fraud would have supported claim brought by bankruptcy trustee, plaintiff's claim was not discharged by bankruptcy proceeding as plaintiff had "alleged with particularity that misrepresentations of facts were made by [the defendant] in furtherance of a conspiracy to defraud [the plaintiff]").

Nor does our decision in *Teachers,* 803 F.2d 61, control the outcome of this case. In *Teachers,* the question was whether the automatic stay provision applied to bar a certain cause of action. Here, while the construction of the automatic stay provision may be relevant, it is not dispositive, because if the claims are property of the debtor, they must be *abandoned* by the trustee before they can be asserted by individual creditors, *see* 11 U.S.C. § 554. Additionally, there was an attempt in *Teachers* by the general partners to avoid a judgment previously handed down by the district court. There is no such attempt here. Finally, the action in *Teachers* was a breach of contract claim, which we held to be a non-core proceeding under the Bankruptcy Code. *See* 28 U.S.C. § 157(b) (Supp. V 1987). PepsiCo's claims, however, are core proceedings as defined by section 157(b)(2). These claims, although pleaded as claims personal to PepsiCo, if they are property of the corporation or are claims available to all creditors, are claims regarding the transfer of property to the estate, as they would result in Banner's assets being available to pay Lee Way Holding Co.'s debts. Section 157(b) includes within the definition of core proceedings "proceedings related to the property of the estate," *MacArthur Co. v. Johns–Manville Corp. (In re Johns–Manville),* 837 F.2d 89, 91 (2d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988), and property of the estate, in turn, includes causes of action that are the property of the debtor, *id.* 837 F.2d at 92. It follows that proceedings having the effect of bringing property into the estate of the debtor are core proceedings as defined by section 157(b). *See* 28 U.S.C. §§ 157(b)(2)(E) ("orders to turn over property of the estate" are core proceedings), 157(b)(2)(F) ("proceedings to determine, avoid, or recover preferences" are core proceedings), 157(b)(2)(H) ("proceedings to determine, avoid, or recover fraudulent conveyances" are core proceedings).

◼ We realize that here it is Banner, the alleged alter ego, rather than the bankruptcy trustee that is contesting PepsiCo's assertions, and that the bankruptcy trustee has apparently not moved to stay these proceedings or to intervene in this case.

Nor has PepsiCo attempted to obtain a decision that the trustee has abandoned the causes of action asserted here. We are also aware that Banner may at the appropriate time seek review of rulings made in *Luper.* Nevertheless, we believe that under the Bankruptcy Code and the circumstances of this case, if either of PepsiCo's asserted causes of action in this suit is property of the debtor or a claim otherwise properly asserted by the bankruptcy trustee, PepsiCo does not have *standing* to raise that cause of action outside of the bankruptcy proceeding.[3] Even if PepsiCo could overcome this jurisdictional hurdle, it would still have to show an abandonment of the claim by the bankruptcy trustee, 11 U.S.C. § 554, or a grant of relief from the automatic stay, 11 U.S.C. §§ 362(d), (e), to press its claims outside of the bankruptcy proceedings.

■ Finally, PepsiCo argues that because the Tenth Circuit has allowed Banner to assert claims against PepsiCo outside of the bankruptcy court, PepsiCo should be allowed to assert claims against Banner as well. The decision to which PepsiCo refers, *Courtney v. Commercial Lovelace Motor Freight, Inc.,* No. 86–2846 (10th Cir. Oct. 24, 1988), is an unreported order and judgment. Therefore it has "no precedential value" other than for the purposes of res judicata, collateral estoppel, and the law of the case. Tenth Cir.R. 36.3. PepsiCo urges that Banner is bound by the collateral estoppel effect of *Courtney* in this Court and must accede to PepsiCo's standing. We disagree. This Court is not bound by the Tenth Circuit's interpretation of the law of bankruptcy proceedings and standing. Nor do we believe that Banner would be bound by *Courtney* in any event. *Courtney* concerned whether a surety

(Banner) who was subrogated to a bankrupt's claims could bring those claims outside of the bankruptcy proceeding. Although PepsiCo makes a brief attempt to argue that it is subrogated to Lee Way's claims, we are unpersuaded. PepsiCo had no contractual right to subrogation, and we do not believe that equity compels the application of the subrogation doctrine to the circumstances here, *cf. Caplin,* 406 U.S. at 440, 92 S.Ct. at 1691 (Douglas, J., dissenting) (quoting Restatement of Restitution § 162 (1937)). Even if PepsiCo were subrogated to Lee Way's rights, Lee Way does not have a sufficiently particularized claim against Banner to allow PepsiCo to bring an action such as this. Lee Way's claim against Banner is not for the default on the bonds. Rather, it is a generalized claim that Banner's looting caused Lee Way's insolvency which in turn caused Lee Way's default on the bonds. *Courtney* simply does not control the standing issue in this case.

Neither party challenges the district court's determination that Ohio state law applies to the alter ego doctrine and the claim of Banner's alleged tortious acts. We agree with that determination. With this framework in mind, we turn to the causes of action PepsiCo alleges in this case.

### d. *The Alter Ego Doctrine*

■ The basic principles of the alter ego doctrine in Ohio were set forth in *Bucyrus–Erie Co. v. General Products Corp.,* 643 F.2d 413 (6th Cir.1981). To prevail on an alter ego claim, the plaintiff must prove three essential elements:

(1) domination and control over the corporation by those to be held liable is so complete that the corporation has no sep-

---

3. *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 62 n. 4 (2d Cir.1985), does not stand for a contrary proposition. In that case, we determined that a debtor corporation did not sustain injury at the hands of the defendant-third party that was remediable under 15 U.S.C. § 78j(b) (1982). We noted that, in any event, the plaintiff-trustee did not have standing to assert claims of defrauded securities purchasers, whose injuries may have been compensable under the securities laws. In making this determi-

nation, which under our analysis was not necessary to the outcome of the case, we stated that "[t]he Trustee in bankruptcy has standing to represent only the interests of the debtor corporation." *Bloor,* 754 F.2d at 62 n. 4. Our decision today goes no further than to say that causes of action that could be asserted by the debtor are property of the estate and should be asserted by the trustee, as should causes of action such as those that fall under 11 U.S.C. §§ 544, 547, 548.

arate mind, will, or existence of its own; (2) that domination and control was used to commit fraud or wrong or other dishonest or unjust act, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Id.* at 418. The crux of the action, however, is that maintaining the separateness of the corporation and its alter ego would allow the alter ego to avoid either an otherwise enforceable obligation, or the law, or that maintaining the separate corporations would be inequitable. *See, e.g., id.; E.S. Preston Assocs. Inc. v. Preston,* 24 Ohio St.3d 7, 11, 492 N.E.2d 441, 446 (1986) (per curiam); *North v. Higbee Co.,* 131 Ohio St. 507, 510–27, 3 N.E.2d 391, 393–99 (1936), *cert. denied,* 300 U.S. 655, 57 S.Ct. 432, 81 L.Ed. 865 (1937); *Damascus Mfg. Co. v. Union Trust Co.,* 119 Ohio St. 439, 447, 164 N.E. 530, 533 (1928); *Saeks v. Saeks,* 24 Ohio App.3d 67, 70–71, 493 N.E.2d 280, 283 (1985); *Khoury v. Board of Liquor Control,* 141 N.E.2d 787, 789 (Ohio Ct.Com. Pleas), *aff'd,* 153 N.E.2d 334 (Ohio Ct.App. 1957); *see also* W.M. Fletcher, J.J. Reinholtz & D.L. Nelson, *Cyclopedia of the Law of Private Corporations* § 41.30 (Perm. ed. Supp.1988); F.J. Powell, *Parent and Subsidiary Corporations* § 13(g), at 78 (1931) ("the entire doctrine is … a medium to further justice by relieving a complainant of the injustice that would result if the defendant were permitted to abuse the incorporation privilege and then to claim the immunity that normally goes with that privilege").

Although no Ohio case directly addresses whether a corporation may bring an alter ego action against its own parent, the basis for the action in Ohio is the avoidance of some wrong or injustice that would result if the separateness of a corporation and its alter ego were maintained. If injustice would result from a corporation's not being recognized as the alter ego of its subsidiary, and that subsidiary brought an alter ego action against the parent, there is nothing to indicate that such an action would not be recognized in Ohio. To the contrary, the purpose of the alter ego action would be frustrated, and injustice could result, if an alter ego action between a

parent and a subsidiary were not recognized. *See S.I. Acquisition,* 817 F.2d at 1152 (finding that Texas law would allow corporation to bring alter ego action); *Luper,* slip op. at 14–15.

*Friedman,* 20 Ohio Cir. Dec. 303, cited in *D.H. Overmyer,* does not compel a different result. In that case, a bankruptcy trustee brought an action against five defendants who, the trustee alleged, helped to secrete assets of the bankrupt. The court held that, under Ohio state bankruptcy law, "[n]o right of action against the defendants and in favor of the bankrupt, which would pass to his trustee in bankruptcy, ever existed." *Id.* at 304. According to the court, under state bankruptcy law, the trustee received only the bankrupt's rights of action resulting from a contract or the taking of or injury to property, and these actions were only available to the trustee if they existed at the date of the declaration of bankruptcy. Events that occurred during the course of the bankruptcy proceeding, as did the events in question, could not be the basis of a cause of action brought by the trustee. *Id.* at 304–05. Accordingly, because no wrong had been done to the trustee or the trustee's property, the complaint failed to state a cause of action. *Id.* at 305.

*Friedman* is of little help to the analysis of modern alter ego law. Not only was the trustee in that case not contending that the defendants were the alter ego of a legal entity such as a corporation, he was not even contending that they were the debtor's agents. In addition, federal bankruptcy law specifically provides for the avoidance of property transfers occurring subsequent to the filing of a bankruptcy petition. 11 U.S.C. § 549 (1982 & Supp. V 1987).

 Nothing in modern Ohio law indicates that a corporation may not bring an action against its parent on an alter ego theory. We believe that, under Ohio law, a corporation would be able to assert an alter ego cause of action against its parent corporation. The cause of action therefore becomes property of the estate of a bank-

rupt subsidiary, and is properly asserted by the trustee in bankruptcy.

Nevertheless, PepsiCo is asserting its alter ego action not on behalf of Lee Way Holding Co., but as a creditor. If, however, the cause of action is a general one, and does not accrue to PepsiCo individually, PepsiCo cannot seek individual relief outside of the bankruptcy court. *See Koch Refining*, 831 F.2d at 1349, *see also Steyr–Daimler–Puch*, 852 F.2d at 136 (if trustee could and did bring alter ego claim on behalf of estate, court need not reach question whether creditors' rights also provided a cause of action for the trustee).

PepsiCo has not alleged the type of harm necessary to support a finding of standing. Its injury is not a particular one that can be directly traced to Banner's conduct. Instead, it has alleged a secondary effect from harm done to Lee Way. *See ASARCO*, 109 S.Ct. at 2040; *Allen*, 468 U.S. at 750–51, 104 S.Ct. at 3324; *Ad Hoc Committee*, 873 F.2d at 28; *Koch Refining*, 831 F.2d at 1353–54. This is not the sort of "injury sufficiently 'direct and personal [that] satisf[ies] the case or controversy requirement of Article III.' " *Ad Hoc Committee*, 873 F.2d at 28 (quoting *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Rather, it amounts to no more than an allegation that Banner's acts harmed a third party and that that harm in turn led to PepsiCo's harm.

Although PepsiCo alleges that it has suffered individual harm due to Banner's relationship with CL, as PepsiCo would have structured its deal with CL differently had it known of Banner's "true" relationship with CL and its intent to use CL to strip Lee Way of its assets, PepsiCo has not shown that this harm differs in kind from the harm suffered by any other creditor of CL or Lee Way.

PepsiCo's personalization of the harm stems from its original relationship to Lee Way. Because Lee Way was the entity that was stripped of assets, and because PepsiCo was the seller of Lee Way, PepsiCo asserts that its harm is direct and specific to it. To the contrary, however, PepsiCo's harm is precisely that suffered by all other creditors of CL and Lee Way: because CL and Lee Way were used by Banner to preferentially pay off debts owed to Banner, all other creditors of CL and Lee Way fell into disfavored positions. The source of the assets used to finance the payments to Banner is of no moment: if we were to stretch PepsiCo's theory to the limit, the source of any asset of either CL or Lee Way that was sold to obtain money to pay Banner would be a preferred creditor. That is, if a company sold CL equipment on credit, and CL sold that equipment to pay Banner, then, under PepsiCo's theory, the company that sold the equipment to CL would have sustained particularized harm if it were not paid. This, however, is precisely the situation that the Bankruptcy Code is designed to eliminate. *See Lincoln Savings Bank v. Suffolk County Treasurer (In re Parr Meadows Racing Ass'n, Inc.)*, 880 F.2d 1540, 1545 (2d Cir.1989). All unsecured creditors are to be treated equally if their injuries are not different in kind. PepsiCo is "similarly situated to other creditors who have been treated inequitably by the debtor and thus share in the common injury." *Koch Refining*, 831 F.2d at 1350. The proper remedy in this case for any injustice caused by Banner is for the trustee to bring an alter ego claim as property of the estate, as he has done, or to bring an action alleging preferential or fraudulent transfer of assets to Banner, *see* 11 U.S.C. §§ 547, 548 (1982 & Supp. V 1987).

As is clear from the opinion of the bankruptcy court in *Luper*, an Official Committee of Unsecured Creditors has been formed in this case. Presumably, as PepsiCo is an unsecured creditor of Lee Way Holding Co., and as it has filed a claim in the bankruptcy court against Lee Way Holding Co., PepsiCo is represented by or is a member of the committee. *See* 11 U.S.C. § 1102 (1982 & Supp. V 1987). Thus, not only does it have a voice through which to articulate its claim against Banner in the bankruptcy court, *see* 11 U.S.C. § 1109(b) (1982), but its claim of alter ego has already been filed in the bankruptcy court and is being litigated.

Therefore, because an alter ego claim is the property of the estate, and because the injury in this case is a generalized one, which is already being litigated by the bankruptcy trustee and by the unsecured creditors' committee, PepsiCo does not have standing to assert its alter ego claim outside of the bankruptcy proceeding.

### e. *PepsiCo's Allegations of a Direct Cause of Action*

██ PepsiCo also alleges that it agreed to sell Lee Way to CL "on the explicit understanding that CL would use its best efforts to maintain Lee Way as an ongoing, viable, operating company," and that CL did not do this. According to PepsiCo, CL's failure to live up to its agreement was due to Banner, which caused CL to apply Lee Way's assets to pay off CL's liabilities to Banner. Therefore, PepsiCo contends that if it is liable to St. Paul, "all such liability will have been caused in whole or material part by the wrongful diversion of Lee Way assets caused by ... Banner, and [Banner] should be required to indemnify and pay over to PepsiCo the amount of any adjudged liability."

In its briefs to this Court, PepsiCo declares that the district court erred by not making specific findings regarding this claim before it granted summary judgment to Banner. However, it is not clear to us that PepsiCo has even alleged a cause of action that exists under Ohio law. PepsiCo's complaint does not allege that Banner perpetrated a fraud on PepsiCo. Rather, it contends that "diversion of assets is itself an actionable wrong." To support this view of the law, it cites a Fourth Circuit case applying Virginia law and an unreported Ohio appeals court case.

The first of these cases, *National Carloading Corp. v. Astro Van Lines, Inc.,* 593 F.2d 559 (4th Cir.1979), based its decision on cases applying Kentucky, Kansas and Nebraska law. *National Carloading* held that a company that was a "continuation" of another company, which transferred assets in bad faith "to evade debts," and which left the other company "with no assets with which to pay its debts," was

liable for the other company's debts. The second case cited by PepsiCo, *J.B. Stoves, Inc. v. White Castle System, Inc.,* No. 84AP–446 (Ohio Ct.App. Jan. 28, 1986) (available on LEXIS, States library, Ohio file; and on Westlaw, 1986 WL 1282), does not explicitly indicate that such a cause of action exists in Ohio. *J.B. Stoves* noted that although a plaintiff's complaint did not state an alter ego claim, it did "suggest a claim ... for liability of the [counterclaim defendant corporation's owners] with respect to assets diverted from [that corporation], to the extent that such diversion rendered [counterclaim defendant] unable to pay its obligations to [counterclaim plaintiff]." The *J.B. Stoves* Court made no findings or holding regarding this suggestion.

We think that this statement in *J.B. Stoves* is far from an unequivocal adoption of the cause of action that PepsiCo asserts here. Even if we assume that PepsiCo has stated a valid claim under the law of Ohio, however, we see several problems with PepsiCo's theory. First, as an unreported decision, *J.B. Stoves* is "persuasive authority" only on courts in the state district in which it was rendered. Ohio S.Ct. Rules for Reporting Opinions 2(G)(2). There is no provision comparable to Rule 2(G)(2), however, stating that an unpublished decision is persuasive authority outside of that district. Thus, we are not bound by the holding of *J.B. Stoves.*

██ Second, should we find such a cause of action to exist under Ohio law, we would be left with the same problem that was fatal to PepsiCo's first claim: the problem of standing. PepsiCo alleges that it had an "understanding" with CL and that Banner wrongfully interfered with that understanding. It asserts that Banner's interference harmed it because it breached this less-than-contractual "understanding" between it and CL.

Banner contends that this claim is only that of a general creditor, and that PepsiCo's harm is not particularized. Therefore, Banner argues, PepsiCo cannot assert this claim outside of bankruptcy. We agree. PepsiCo's allegations boil down to a contention that Banner's actions reduced the fund

from which Lee Way's debts would be paid. Although PepsiCo alleges that it had an "understanding" with CL that these assets would be used for paying Lee Way's debts, this is not enough to create the kind of particularized harm necessary to support an action by a creditor outside of the bankruptcy proceeding.

In the end, PepsiCo is alleging that CL's acts resulted in a preferential transfer to Banner. Because PepsiCo contends that it had some sort of right to the proceeds transferred to Banner, based on its "understanding" with CL, PepsiCo contends that it suffered particularized harm. This claim fails. It is often the case that creditors give debtors items that the creditors believe the debtors will put to good use and from which the debtors will profit, so as to be able to pay the creditors. PepsiCo's "understanding" with CL apparently did not limit the use that CL could make of any particular Lee Way asset; PepsiCo has alleged no such limitation. Indeed, CL's offering papers make it plain that sale of assets was not only contemplated by the parties, but was a vital part of the deal. If CL did not sell assets, it would not have been able to buy Lee Way in the first place. PepsiCo's allegations therefore raise no more than a claim of generalized harm to the estate and creditors of CL and Lee Way. This claim is properly asserted by the bankruptcy trustee, *see* 11 U.S.C. § 547, unless it is abandoned, *see* 11 U.S.C. § 554, a circumstance not present here.

PepsiCo nevertheless argues that, if its claim is facially valid, it may bring it outside of the bankruptcy proceedings. We reject this argument. Although we have held that RICO actions against principals of bankrupt corporations may be brought concurrently with a bankruptcy proceeding, *see Bankers Trust*, 859 F.2d at 1101, that decision was based, in part, on the broad construction to be given to the RICO statute itself. In addition, the plaintiff in *Bankers* alleged that the defendants committed fraud, perjury and bribery that induced plaintiff to enter an agreement with defendants' company to reduce a debt owed to it by 82.5 percent, and that defendants instituted frivolous lawsuits costing plaintiff legal fees and costs in an effort to evade their liability. *Id.* at 1098–99. In *Bankers*, unlike the situation in this case, the defendants actually made statements to the plaintiff that the plaintiff alleged were fraudulent. There is no such direct connection between Banner's actions and PepsiCo's injury here. Banner was never a party to the negotiations and contract between CL and PepsiCo. The *Bankers* Court specifically stated that "Bankers does not seek recovery for injuries suffered by [defendants' corporation], but for injuries it suffered directly." *Id.* at 1101; *see also Cumberland Oil*, 791 F.2d at 1042–43 (without allegations of particularized injury by defendant to plaintiff, claim would be precluded by bankruptcy proceedings). In contrast, PepsiCo is seeking recovery for injuries suffered by Lee Way, albeit injuries that indirectly resulted in PepsiCo's liability to St. Paul.

Furthermore, the *Bankers* Court rejected Bankers' argument that it could bring a RICO action to recover for its lost debt, and specified that

[i]t is the bankruptcy court, in the first instance, that has power to appoint a trustee, to order the claim abandoned by the trustee so that Bankers may proceed, or to grant some other relief from the automatic stay. Any argument and decision on this point should thus take place, in the first instance, in the bankruptcy court.

*Bankers Trust*, 859 F.2d at 1107. That is precisely the situation faced by PepsiCo here. If it wishes to proceed with its claim, it must receive relief from the stay in the bankruptcy court, 11 U.S.C. § 362(d), (e), or request that the bankruptcy court make a finding that the claim has been abandoned by the trustee, 11 U.S.C. § 554. It is not sufficient that, as PepsiCo notes, the trustee has not attempted to halt PepsiCo's action on his own initiative or that he has failed to bring a claim similar to PepsiCo's.

For these reasons, we believe that PepsiCo has no claim under Ohio law for injury suffered when Banner allegedly caused CL to strip Lee Way of its assets. Even if PepsiCo has stated a valid claim, it has not

taken the proper action in the bankruptcy court to enable it to proceed independently.

Finally, we realize that "jurisdiction may be proper in more than one forum," *First City Nat'l Bank and Trust Co. v. Simmons*, 878 F.2d 76, 79 (2d Cir.1989). However, our decision today is based on the doctrine of standing; we hold that Congress has given standing over the claims asserted by PepsiCo in this action to the bankruptcy trustee and that PepsiCo, without more than it has shown here, does not have independent standing to bring them. Even if the rule discussed in *First City*, that normally the action filed first has priority over a later action, applied here, these circumstances would mandate that the bankruptcy proceedings be given priority, and the district court should have declined jurisdiction, *see id.* First, the bankruptcy proceeding itself calls into play important considerations about the equal treatment of creditors that would be frustrated by continuation of the district court action. Second, although the adverse action against Banner in the bankruptcy court was filed after the instant action, the bankruptcy proceeding itself was already underway when PepsiCo filed its third-party complaint. Third, "considerations of judicial administration and conservation of resources," *id.* at 80, would have dictated that this action be allowed to proceed in the bankruptcy court.

## CONCLUSION

Because the causes of action asserted by PepsiCo should, under the Bankruptcy Code, be asserted by the bankruptcy trustee, and because PepsiCo has not obtained either an order granting relief from the automatic stay or an order finding that the trustee has abandoned the claims asserted here, and because PepsiCo does not have a particularized and direct injury traceable to Banner, PepsiCo lacks standing in this Court. The judgment of the district court dismissing the third-party complaint is affirmed. No costs.