**Bettie C. HOLCOMB, et al., Plaintiffs,**

v.

**PILOT FREIGHT CARRIERS, INC., et al., Defendants.**

No. C–89–227–WS.

United States District Court, M.D. North Carolina, Winston–Salem Division.

Sept. 14, 1990.

J. Kevin Morton, J. Griffin Morgan, Robert M. Elliot, B. Ervin Brown, II, Winston–Salem, N.C., J. David James, Marion G. Follin, III, Greensboro, N.C., James A. McCall, Teamsters Natl. Frt. Ind., Negot. Comm., James T. Grady, Int. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO, Washington, D.C., for plaintiffs.

Reid Phillips, Greensboro, N.C., Lawrence W. Marquess, Heron, Buchette, Ruckert & Rothwell, Denver, Colo., for defendants.

### ORDER

BULLOCK, District Judge.

On July 30, 1990, the United States Magistrate's Findings and Recommendation was filed and notice was served on the parties pursuant to 28 U.S.C. § 636. Thereafter, the Court received plaintiffs' objections to the Magistrate's Findings and Recommendation.

The Court has appropriately reviewed plaintiffs' objections de novo and finds they do not change the substance of the Magistrate's rulings which are affirmed and adopted.

NOW, THEREFORE, pursuant to the Magistrate's Findings and Recommendation, it is ORDERED that defendants' motion to stay this action pending the lifting of the automatic stay provisions of 11 U.S.C. § 362 be, and the same hereby is, granted but otherwise is denied.

IT IS FURTHER ORDERED that this action be referred to the bankruptcy court of this District (in the case *In re Pilot Freight Carriers, Inc.*, B–89–01552C–7) for further proceedings for disposition of the alter ego claims as more particularly discussed in the Findings and Recommendation.

### MAGISTRATE'S FINDINGS AND RECOMMENDATION

RUSSELL A. ELIASON, United States Magistrate.

This matter comes before the Court on a series of motions. What had started out to be a simple request by defendants to delay discovery has now blossomed into their challenge to this Court's subject matter jurisdiction or at least the plaintiffs' standing to pursue these actions. These actions were filed separately. The plaintiffs are all different in each suit but the defendants are the same. Because the present issues before the Court are the same, the matters are consolidated for purposes of this decision. A brief discussion of the procedural history of these cases is in order.

#### Procedural Posture

The events which provoked these two lawsuits resulted from the closing of Pilot Freight Carriers, Inc. ("Pilot"). The Holcomb suit was filed first, on March 31, 1989. These plaintiffs, who are former nonunion workers of Pilot brought a class action lawsuit alleging (1) Pilot failed to give the 60–day notice required by the newly enacted Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, *et seq.* ("WARN"), (2) a violation of the Employee Retirement Income Security Act,

29 U.S.C. § 1001, *et seq.* ("ERISA"), (3) a violation of the North Carolina Wage and Hour Act, N.C.G.S. § 95–25.1, *et seq.*, (4) common law fraud as to wages and benefits, (5) common law fraud in the liquidation of company assets, and (6) punitive damages. Each of these allegations allege that the defendants, other than Pilot, who had controlling interest in Pilot or each other, all of whom were allegedly ultimately controlled by Allan D. Musgrove, were the alter ego of Pilot and operated Pilot as a mere instrumentality and that within 84 days of obtaining a controlling interest in Pilot, they sold Pilot's assets and eventually closed the company.

The Kinton lawsuit was filed by Pilot's union employees and the union, who seek relief against Pilot for a violation of WARN and alleging that the other defendants were also their employer under WARN and that these defendants aided and abetted Pilot in its actions. In another cause of action, these other defendants are alleged to have pilfered Pilot's assets and operated it as their mere alter ego. Finally, Pilot was cited for violating the North Carolina Wage and Hour Act.

In the summer of 1989, the matter came before the Court on plaintiffs' motion for a preliminary injunction. On June 20, 1989, a hearing was held. Before a decision was reached, Pilot was brought into bankruptcy court by an involuntary Chapter 7 petition which automatically stayed this and any related actions involving Pilot. *In re Pilot Freight Carriers, Inc.,* B–89–01552C–7 (M.D.N.C.). These matters are reflected in a July 27, 1989 Order. In that Order, the court found the request for preliminary injunctive relief to be moot, because of the bankruptcy, with respect to the then present assertions, and thus the motion for preliminary injunction was denied without prejudice. Because of these rapid turn of events, the Court *sua sponte* directed that plaintiffs supplement their motion for class certification and their motion to amend and supplement their complaint in order to address the new problems facing the Court as a result of Pilot's bankruptcy proceeding. (August 7, 1989 Order.)

In September, 1989, plaintiffs' motion for class certification (Kinton) or its supplementation (Holcomb) was filed. Instead of responding directly to that motion, the non-bankrupt defendants (hereinafter simply referred to as defendants) filed a motion to stay discovery until the bankruptcy court lifted the automatic stay resulting from 11 U.S.C. § 362 with respect to Pilot Freight. They also moved for an order completely staying this action pending a lifting of the section 362 automatic stay. Finally, defendants request a stay pursuant to the Court's general equitable powers found in 11 U.S.C. § 105(a). Plaintiffs in both actions opposed the motion. Interestingly, the Kinton plaintiffs argue that the bankruptcy court has jurisdiction over these actions pursuant to 28 U.S.C. § 157(a).

The Kinton plaintiffs argue as follows. Section 157(a) provides each district court with the discretion to refer cases defined in Section 157 to the bankruptcy judge. This Court, in its Standing Order No. 10, activates the automatic referral provisions of Section 157 and refers "cases under Title 11 of the United States Code, and proceedings arising under Title 11 of the United States Code or arising in or related to cases under Title 11...." Additional, but not exclusive jurisdiction, is provided the district court as to all civil proceedings arising under Title 11 or related to cases under Title 11 in 28 U.S.C. § 1334(b). A "related case" has been defined by the Third Circuit in *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984), to be as follows:

> The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.* [citations omitted] Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

The Fourth, Fifth, Eighth and Ninth Circuits have adopted this definition. *In re A.H. Robbins Co.*, 788 F.2d 994, 1002 n. 11 (4th Cir.) (dicta), *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986); *In re Fietz*, 852 F.2d 455, 457 (9th Cir.1988) (listing cases).

According to the Kinton plaintiffs, these actions are purportedly already pending in the bankruptcy court because of the automatic referral. On this basis, the Kinton plaintiffs expressly object to this Court staying discovery or staying this action pursuant to either 11 U.S.C. § 105(a) or § 362(a)(1). And, in any event, both sets of plaintiffs argue that these sections do not support a stay of discovery or of the actions.

After plaintiffs filed their response, defendants filed a reply and raised an entirely different issue. For the first time, defendants now argue that the bankruptcy petition against Pilot and the appointment of a bankruptcy trustee strips the plaintiffs of any right to bring independent causes of action on theories of alter ego against defendants because such claims are a property of the bankruptcy estate and may only be asserted by the bankruptcy trustee.

Because of the alter ego claims in the complaints, the defendants also argue that the entire action should be stayed. Clearly, with respect to the Holcomb case, that complaint does allege in each cause of action that defendants acted as Pilot's alter ego. However, the Kinton plaintiffs only allege an alter ego claim in Count II of the complaint. Count III which alleges aiding and abetting may well be a mere variant of an alter ego claim. However, in Count I, plaintiffs allege that defendants in fact were the employees' employer in that they were a "common business enterprise" as used to define an employer by WARN. The defendants gloss over this distinction and fail to address the problem of the non-alter ego claims in the Kinton complaint. Plaintiffs themselves do not adequately address the issue of how the Court should proceed with the non-alter ego claims if it accepts defendants' argument with respect to the alter ego claims. Because the Court finds the defendants have the better of the argument, this problem will have to be addressed.

### Discussion

The question of whether the bankruptcy trustee is the proper party to bring an alter ego claim has been the subject of much recent litigation. The Second Circuit Court of Appeals was the last one to announce its position. In *St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688 (2d Cir.1989) ("PepsiCo"), it surveys the recent litigation. *Id.* at 696. It, along with the Fourth, Fifth, Seventh and Tenth Circuits, has determined that whether a bankruptcy trustee alone has a right to bring alter ego claims, on behalf of unsecured creditors and the debtor corporation, is a matter which ultimately depends on whether the relevant state law provides that such actions belong to the corporation and creditors in general. In each instance, those courts have found state law created such a right. Only the Eighth Circuit, relying on Arkansas law, has found to the contrary, in *In re Ozark Restaurant Equipment Co.*, 816 F.2d 1222 (8th Cir.), *cert. denied*, 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987).

In the instant case, the parties explicitly recognize that a decision by this Court is controlled by the Fourth Circuit's decision in *Steyr–Daimler–Puch of America Corp. v. Pappas*, 852 F.2d 132, 135 (4th Cir.1988). There, the Court considered the authority of a bankruptcy trustee to control litigation involving third parties where it is alleged that the debtor corporation was the alter ego of the non-bankrupt third party. The court found that a trustee might be able to assume such derivative authority from "two sources: (1) the rights of the debtor, 11 U.S.C. § 541, and (2) the rights of creditors of the debtor, 11 U.S.C. § 544." *Id.* at 135. In order to determine whether a trustee has control over an alter ego claim, it looked to state law. *Id.* at 135. The Court held that under Virginia law it was clear that an alter ego claim was the property of the estate, citing *Pepper v. Dixie Splint Coal Co.*, 165 Va. 179, 181 S.E. 406 (1935). Therefore, section 541 provided au-

thority to, and vested standing in, the trustee for the purpose of pursuing and litigating such claims. (The court did not reach the issue of whether the trustee had power under Section 544 to bring an action in his capacity as a representative of the creditors.[1])

Because the status of state law is important to resolving whether the bankruptcy trustee has exclusive control over alter ego claims, it will be helpful to examine *Pepper v. Dixie Splint Coal Co., supra,* to determine the status of the state law which triggered the Fourth Circuit's decision. That case involved an accounting action for rents and royalties due under a lease. Certain individuals used a corporation to begin a mining operation under the lease. Assets of the corporation were transferred to a partnership, which paid nothing for the assets, and operated the mine under the lease until a little later when it transferred the assets, including the lease, to a new corporation. The last corporation was adjudicated bankrupt. The same individuals owned the entire businesses of the three companies. The Virginia Supreme Court held that these individuals had the actual and ultimate control and ownership of the businesses and because of their complete dominance and control, the court would look at the substance of the matters, ignore the corporate fictions, in order to prevent "the real and responsible parties [from escaping] liability by turning over their property from one entity to another." 181 S.E. at 410. To do otherwise "would be a fraud." *Id.*

The instant plaintiffs differ in their responses to the Fourth Circuit's decision in *Steyr* and its interpretation of *Pepper.* The Holcomb plaintiffs recognize that this Court is bound by the decision in *Steyr* and, therefore, if it should find that the state law of North Carolina treats alter ego claims as tantamount to being property of the corporation, then this Court would be required to find that the Pilot bankruptcy trustee alone has standing to pursue this action, not plaintiffs, and this action must

be dismissed or referred to the bankruptcy court. Consequently, the Holcomb plaintiffs argue that the law of North Carolina differs from Virginia law and that corporations under North Carolina law do not acquire an equitable interest in the assets of an alter ego even if the corporation and the alter ego are one and the same in the eyes of the law.

The Holcomb plaintiffs argue that in *Steyr,* the Fourth Circuit found that Virginia adopted "an identity" theory of the alter ego doctrine which has been more fully explained by a bankruptcy court in *In re Western World Funding, Inc.,* 52 B.R. 743 (Dist.Nev.1985). That court, interpreting the Nevada alter ego doctrine, found that the doctrine does not rest upon any considerations of the particular creditors' dealings with defendants and, therefore, when a bankruptcy trustee brought an alter ego action, it did so in order to establish the identity of the debtor corporation which, if alter ego is established, would show that the third party is in fact part of the debtor corporation. It distinguished other purported decisions which merely shifted the liability for corporate debts to a third party as opposed to establishing the true identity of the debtor corporation.

The Holcomb plaintiffs contend that North Carolina law is radically different from Nevada and Virginia law and that it has not adopted an identity theory of alter ego but has adopted an instrumentality rule which is merely an equitable doctrine to shift liability to third parties, citing *Glenn v. Wagner,* 313 N.C. 450, 329 S.E.2d 326 (1985). Plaintiffs base their argument on the fact that the North Carolina Supreme Court lists three elements which would support the instrumentality rule, to wit: (1) control, (2) that the control was used to commit fraud or wrong, and (3) proximate cause. According to plaintiffs, this shows that North Carolina does not have an "identity" alter ego rule which looks to see whether the corporations and the alter ego are one and the same but has

---

**1.** The Seventh Circuit has held that the trustee may bring an alter ego claim under either 11 U.S.C. § 541 or § 544. *Koch Refining v. Farm-* *ers' Union Cent. Exch.,* 831 F.2d 1339 (7th Cir. 1987), *cert. denied,* 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988).

adopted the above noted three part test which makes any claim personal to the injured plaintiff.

The Holcomb plaintiffs' reading of North Carolina law is too restrictive. In the very case cited by plaintiffs, *Glenn v. Wagner, supra,* the court did not list the three elements as being the only way to establish alter ego liability.[2] In *Glenn v. Wagner, supra,* the court merely stated that these three elements would "support" an attack on a corporate entity. 329 S.E.2d at 330. Prior to that, it identified the instrumentality rule as one which forms the basis for disregarding the corporate entity. It comes into play when a corporation exercises actual control over another, making the latter its mere instrumentality or tool. *Id.* at 330. Factors which could be used to pierce the corporate veil are inadequate capitalization, non-compliance with corporate formalities, excessive fragmentation, non-payment of dividends, insolvency of the debtor corporation, syphoning of funds by the dominate shareholder, non-functioning of other officers or directors, and absence of corporate records, citing *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* 540 F.2d 681 (4th Cir.1976). *Id.* 329 S.E.2d at 332.

However, the court did not stop there. It also held that in a rare instance, the corporate veil may be pierced even though the domination does not extend to the transaction which is attacked. This comes about when the identities of the two corporations are the same. Thus, it stated: "It is sufficient where, as here, one affiliated corporation is dominated by another to the extent that the dominated corporation has no separate mind, will or *identity* of its own." *Id.* at 331. The court went on to

find that the purpose of the equitable doctrine of the alter ego rule was to place the burden of loss on the party who should be held responsible, looking at reality as opposed to form. In the case before it, the evidence showed that the subsidiary corporation was totally dominated by an individual shareholder and the parent corporation.

The alter ego doctrine was further expanded by the North Carolina Supreme Court in *State ex rel. Util. Com'n v. Nantahala Power,* 313 N.C. 614, 332 S.E.2d 397 (1985), *rev'd on other grounds,* 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986). In this case, a utility was run in such a manner that it did not have the financial resources to refund a reduction in utility rates and rebates ordered by the Utilities Commission. The utility's parent company was made a party to the proceedings. Ultimately, it was held to be responsible for refunding such portions of the total refund obligation as the utility itself was unable to refund. The parent company appealed. The evidence disclosed that the parent company operated the subsidiary utility as a means of obtaining cheap electrical power for its aluminum production. It totally dominated the utility and all of its transactions and ran the utility for its own benefit.

The parent company appealed and argued the ruling was not supported because the Utility Commission only made findings that the parent dominated the utility and left it an empty shell. The parent company pointed out that under North Carolina law the three part test of control, fraud or wrongdoing and proximate cause must be established. The North Carolina Supreme Court rejected the argument and pointed out that it has never required a showing of fraud in order to pierce the corporate veil.

**2.** The North Carolina Supreme Court has established three elements which may be utilized to attack the separate corporate identity under the instrumentality rule as follows:

(1) Control, not mere majority or complete stock control, but complete denomination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must approximately cause the injury or unjust loss complained of.

*Glenn v. Wagner,* 313 N.C. 450, 329 S.E.2d 326, 330 (1985) (quoting *B–W Acceptance Corp. v. Spencer,* 268 N.C. 1, 149 S.E.2d 570, 576 (1976)).

(The alter ego doctrine may be implemented upon showing a wrong or that control was used to perpetuate the violation of a statutory or other positive legal duty or a dishonest or unjust act in contravention of plaintiff's legal rights. 332 S.E.2d at 464.) Next, it pointed out that in *Glenn v. Wagner, supra*, it explicitly held that the domination need not relate to the particular transaction which is in question. Thus, in the case before it, the domination was so extensive that there was no need for a showing or finding that the parent company in fact pilfered assets and caused injury to any particular creditor.

*Nantahala* was an identity-type alter ego case. It involved a situation where the parent company so dominated and controlled the subsidiary that it had no assets to pay *future* debts. There was no showing of fraud or the raiding of the assets of the subsidiary. Yet, because there was no separate identity between the corporations, the North Carolina Supreme Court held that the parent company was responsible for whatever refunds would be necessary, including future refunds. The case presented one of those "rare" instances where there was no separate identity between the parent and the subsidiary corporation. *Nantahala* clearly establishes that North Carolina does have an identity caveat to its alter ego rule which will make the controlling corporation liable, not just for the debts of the alter ego corporation, but also as to future obligations.

This identity caveat to the alter ego rule arises from the paramount purpose of the North Carolina rule which is to prevent injustice. *Id.* at 465. The identity caveat rule provides protection against abuse of one of the principal benefits to corporations, *i.e.*, limited liability. As stated in *Park Terrace v. Phoenix Indemnity Company*, 243 N.C. 595, 91 S.E.2d 584, 587 (1956):

The doctrine that a corporation is a legal entity existing separate and apart from the persons composing it is a legal theory introduced for purposes of convenience and to subserve the ends of justice. The concept cannot therefore, be extended to a point beyond its reason and policy, and when invoked in support of an end subversive to this policy, will be disregarded by the courts. Thus, in an appropriate case and in furtherance of the ends of justice, a corporation and the individual or the individuals owning all its stock and assets will be treated as identical, the corporate entity being disregarded where used as a cloak or cover for fraud or illegality.

This statement makes clear that the North Carolina alter ego doctrine is a flexible one. Where domination and control are complete, then in that "rare" case, the court will simply disregard the corporate fiction and treat the individuals and corporations as one party. *See also Copley Triangle Associates v. Apparel America, Inc.*, 96 N.C.App. 263, 385 S.E.2d 201 (1989) and *Greenville Buyers Market Associates v. St. Petersburg Fashions, Inc.*, 97 N.C.App. 136, 387 S.E.2d 234 (1990) (for jurisdictional purposes, the acts of a sham corporation are those of its masters).[3] Thus, in North Carolina an alter ego and its subsidiary may be treated as one company. The alter ego's assets may be used in whatever way is needed to serve justice, even to the extent of paying future debts. There is no need to show a pilfering of assets. The injury need not arise from the specific transaction involving the plaintiff but can arise from general injury to the creditors and the debtor corporation.

■ Having completed this examination of North Carolina law, the Court finds it to be entirely consistent with the Fourth Circuit's requirement in *Steyr* that a corporation may be said to have an equitable interest in the assets of an alter ego when they are one and the same. *Steyr*, 852 F.2d at 136. Thus, in North Carolina, alter ego claims, which are based on factors which establish that the controlled corporation

---

3. *See Federated Dept. Stores v. J.V.B. Industries*, 894 F.2d 862, 869 (6th Cir.1990), where the court noted a distinction between alter egos which treated the corporation as a mere instru- mentality and the much greater abuse of the corporate form which involves a sham corporation.

and the alter ego have the same identity, belong to the bankruptcy estate and must be prosecuted by the trustee. As a result, the Holcomb plaintiffs lack standing to pursue their complaint in this Court. *Id.*

The Kinton plaintiffs, as previously noted, have already stated that the instant actions are related to the Pilot bankruptcy matter to the extent that they should be deemed to have been automatically referred to the bankruptcy court. Therefore, when defendants make their jurisdictional and standing objections, the Kinton plaintiffs are put in an awkward position of objecting to defendants' argument that the trustee in bankruptcy should prosecute these matters because plaintiffs had already argued this matter has automatically been referred to the bankruptcy court. However, the Kinton plaintiffs do resist defendants' motion and argue from a slightly different platform than the Holcomb plaintiffs.

The Kinton plaintiffs start by stressing the fact that the basis for their complaint against the defendants is premised on defendants alleged federal statutory violation of WARN. The Kinton plaintiffs think it significant that in *Steyr, supra*, the action was based on the state common law of Virginia relating to debt collection. They argue that because their rights originate under federal law, state law cannot dictate the outcome. Plaintiffs fear that the rights of the different plaintiffs-employees will depend on the state of their residence. To support their position, the Kinton plaintiffs point to the language where the Fourth Circuit states: "Under *Virginia law* an alter ego claim is property of the estate under section 541(a) [of Title 11]." *Steyr*, 852 F.2d at 136 (emphasis added).

Plaintiffs misconstrue this language in *Steyr* which refers to Virginia law. In stating that alter ego claims under "Virginia law" are property of the estate, the

Fourth Circuit did not mean to distinguish between causes of action premised on federal law as opposed to state law. Rather, it was making the point that when an alter ego claim is made which will involve property of the debtor, the court looks to the state law which governs the bankruptcy estate, in order to determine whether the property or property right belong to the estate or not. Thus, it is not significant whether the underlying cause of action is premised on federal or state law. Rather, the significance is whether an alter ego claim may, under state law, subject or control the property of the alter ego, so as to make it or a portion of it part of the bankruptcy estate. The relevant state law will be that which pertains to the bankruptcy estate not the plaintiffs' residence.

While plaintiffs have thus misstated the issue, their objection is not totally without merit. However, the relevant question is not whether plaintiffs' cause of action is premised on federal or state law but rather, whether plaintiffs have alleged a direct cause of action against the alter ego. *St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d at 704–05. By a direct cause of action, it is meant that in order to remain in this Court plaintiffs must show they were injured by actions which can be directly traced to the alter ego's conduct as opposed to alleging harm from the secondary effects of injury by defendants to Pilot. *Id.* at 704. Alter ego claims such as the ones in this case most often involve harm from secondary conduct since such claims are based on allegations that the bankrupt debtor was run as a sham corporation.

In the instant cases, all plaintiffs' alter ego claims allege injury to creditors in general, *i.e.*, secondary conduct, because the defendants allegedly looted Pilot's assets and otherwise destroyed it as a viable corporation.[4] However, the Kinton plaintiffs

---

**4.** This is made clear by the Holcomb plaintiffs when they argue against a stay of this action. They state:

> Indeed, the plaintiffs' primary claims hinge on their being able to discover and trace funds and assets which the co-defendants allegedly took from Pilot to cover their debts.

Such facts may establish the plaintiffs' "alter ego" and conspiracy claims which go to the heart of the plaintiffs' action. Obviously, delays in this action permit more time for assets to change forms and hands, and make it more difficult for the plaintiffs to establish this vital connection.

conceivably allege a direct cause of action in Count I claiming the defendants are employers in their own right, independent and in addition to their alter ego claim.[5] Before deciding whether the Kinton plaintiffs have alleged a direct cause of action in Count I, it will be helpful to look at whether there is a federal alter ego doctrine and how it compares with expanded statutory definitions of terms such as "employer."

■ The alter ego doctrine has an independent basis in federal law. If the cause of action is based on a federal question (28 U.S.C. § 1331), then federal common law is used to determine the parameters of the alter ego doctrine. *United Steelworkers of America v. Connors Steel Co.*, 855 F.2d 1499, 1506 (11th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1568, 103 L.Ed.2d 935 (1989). *See generally Seymour v. Hull & Moreland Engineering*, 605 F.2d 1105, 1110 (9th Cir.1979), and *Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir.1980). *See United States v. Jon–T Chemicals, Inc.*, 768 F.2d 686, 690 n. 6 (5th Cir.1985), *cert. denied*, 475 U.S. 1014, 106 S.Ct. 1194, 89 L.Ed.2d 309 (1986) (without deciding whether there must be a uniform federal rule); *United States v. Golden Acres, Inc.*, 702 F.Supp. 1097, 1102–04 (D.Del.1988), *aff'd*, 879 F.2d 860 (3d Cir.1989) (unpublished). Thus, in federal questions cases, the Court must use federal common law, not state law. *United States v. Sutton*, 795 F.2d 1040, 1060 (Em.App.1986), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 873, 93 L.Ed.2d 828 (1987). The burden is on the party asserting the alter ego doctrine and fraud is not needed to establish alter ego liability. *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681; and *United States v. Jon–T Chemicals, Inc.*, 768 F.2d 686.

Federal question cases, based on remedial statutes, present issues common to those involved with alter ego liability. In defining an employer, Congress often adopts an expansive definition of that term. In such an instance, less importance is placed on the corporate form and the inquiry of who is an employer usually gives less respect to the corporate form than when applying the common law alter ego doctrine. *Laborers' Pension Trust Fund v. Weinberger Homes*, 872 F.2d 702, 705 (6th Cir.1988) (ERISA); *Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir.1981) (Clean Air Act, 42 U.S.C. § 7607); *United States v. Kayser–Roth Corp.*, 724 F.Supp. 15, 23 (D.R.I.1989) (CERCLA); *S.E.C. v. Elmas Trading Corp.*, 620 F.Supp. 231, 234 (D.Nev.1985), *aff'd*, 805 F.2d 1039 (9th Cir. 1986) (securities). For example, such decisions may turn on whether the parent company controls employment practices and decisions of the subsidiary and dominates the subsidiary, not just through commingling funds or assets but whether it uses the same work force and officers. *Johnson v. Flowers Industries, Inc.*, 814 F.2d 978, 981 (4th Cir.1987) (Age Discrimination in Employment Act case).

It is possible that a plaintiff asserting a federal cause of action may seek to hold a parent company liable not only as an alter ego, but also as an employer. *See Laborers' Pension Trust Fund v. Weinberger Homes*, 872 F.2d 702. When liability is asserted on the basis that defendant is the employer, the plaintiff directly seeks recovery for the wrong done to it by the parent company because it is in fact an employer as defined by law. When liability is asserted on the basis that defendant is an alter ego plaintiff may, for example, seek recovery of a specific amount of money which was converted to the alter ego's benefit by the alter ego or plaintiff may seek recovery from the parent based on more general grounds and for indirect injury such as when the controlled company was operated as a sham corporation. In this latter instance, under North Carolina law and federal law (*DeWitt Truck Brokers, Inc.*, 540 F.2d 681), the plaintiff is harmed because

---

Holcomb plaintiffs' October 13, 1989 brief at 15.

**5.** The Holcomb plaintiffs state that the Court should read their complaint as making a similar direct allegation that the defendants are liable not only as alter egos but also that they are directly liable as employers. However, their complaint does not make this distinction, as does the Kinton complaint, and it has not been amended.

of the injury the alter ego does to the controlled corporation itself when the alter ego totally dominates it and there is no distinction in identity. In this situation, if the controlled corporation is in bankruptcy, the alter ego claim belongs to the bankruptcy estate.

In the instant cases, all the Holcomb plaintiffs' alter ego claims belong to the bankruptcy estate. There is no direct connection between the defendants' actions in these claims and the plaintiffs' injury. However, with respect to the Kinton plaintiffs, the first and possibly third cause of action (which allege that defendants are in fact their employer under WARN and aided or abetted Pilot), allege a direct injury caused to plaintiffs.

It, thus, appears that the bankruptcy trustee has exclusive standing to prosecute the alter ego claims of Holcomb and Kinton and that the Kinton plaintiffs have standing to prosecute claims asserted in Count I and possibly Count III which seek to hold defendants liable for their direct actions to the extent they are a statutory employer under WARN. However, there is no question but that plaintiffs' direct action against the defendants under WARN could affect the bankruptcy proceeding.[6]

Since plaintiffs' alter ego claims will now subject defendants' assets to the bankruptcy estate administration, permitting plaintiffs to maintain an action in this Court while the bankruptcy proceeding is pending as well, would be conflicting and inefficient. First, if plaintiffs were permitted to proceed with part of their action in this Court, a judgment against the defendants could conflict with a judgment entered by the bankruptcy court. Aside from the issue of who is an employer and whether defendants are alter egos, the other issues in Count I (and possibly Count III) of the

Kinton action are the same as in Count II (and in Count I of the Holcomb action). Thus, *res judicata* and collateral estoppel likely will apply. Moreover, should defendants be adjudged liable in both courts, there would be a problem in resolving how to disburse the assets. Thus, as stated in *St. Paul Fire and Marine Ins. Co.*, 884 F.2d at 707, "the bankruptcy proceeding itself calls into play important considerations about the equal treatment of creditors that would be frustrated by continuation of the district court action." Finally, actions pending independently in the bankruptcy court and in this Court would be inefficient. If the federal claim based directly on WARN in the Kinton action could not be tried in bankruptcy court, then at a minimum, it may be better to stay this action until such time as the bankruptcy matter has been resolved. When a plaintiff has an independent federal claim based on a federal statute and also seeks relief under the alter ego doctrine, it would appear the better practice would be to refer the entire matter to bankruptcy court for its consideration until such time as the trustee abandons the claim pursuant to 11 U.S.C. § 544.[7]

The Court now returns to defendants' original motion requesting a stay of these proceedings. The Court finds that both the Holcomb and Kinton plaintiffs seek to hold defendants liable based on the alter ego doctrine. Such an action involves the property of the Pilot bankruptcy estate. In accordance with 28 U.S.C. § 157(a) and Standing Order No. 10, this action should be referred to the bankruptcy judges of this District. Furthermore, the automatic stay provisions of 11 U.S.C. § 362 apply to this action. *Steyr–Daimler–Puch of America Corp. v. Pappas*, 852 F.2d at 136. Any bankruptcy litigation of the alter ego

---

**6.** Difficulties can arise even in the discovery stage. Thus, even after Pilot was put in bankruptcy, the Holcomb plaintiffs requested that the Court make the non-bankrupt defendants produce those parts of Pilot's records which were reasonably available to them. Plaintiffs' Sept. 13, 1989 brief at 8. It is clear that if plaintiffs are allowed to pursue their actions or part of their actions in this Court, there will be some disruption of the Pilot bankruptcy. This

would seem to call for some uniform control over the proceedings, at least through discovery.

**7.** At a minimum, should a Court choose to retain the direct causes of action asserted by plaintiff, it should consider requiring plaintiff to receive relief from the automatic stay, which is applicable to this action in accordance with 11 U.S.C. § 362, before proceeding.

claims will unquestionably affect and impact on the litigation of the very similar claims made by the Kinton plaintiffs directly under WARN. Defendants' request for a stay under 11 U.S.C. § 105(a) fails to identify sufficient unusual facts or needs that cannot be adequately addressed by other provisions of the law, and therefore should be denied. *See In re American Hardwoods, Inc.*, 885 F.2d 621 (9th Cir. 1989).

IT IS THEREFORE RECOMMENDED that defendants' motion to stay these actions pending the lifting of the automatic stay provisions of 11 U.S.C. § 362 be granted but otherwise be denied.

IT IS FURTHER RECOMMENDED that these actions be referred to the bankruptcy court of this District (in the case *In re Pilot Freight Carriers, Inc.*, B–89–01552C–7) for further proceedings for disposition of the alter ego claims and consideration by the trustee of whether he or she must abandon the non-alter ego claims of Count I (and possibly Count III of the Kinton complaint) and for other rulings as may be necessary.

July 30, 1990.

Robert M. Musselman, Charlottesville, Va., for plaintiff.

Irving M. Wolff, Holland & Knight, Miami, Fla., in pro per.

James Hingeley, Boyle & Bain, Charlottesville, Va.

Vance E. Salter, Coll, Davidson, Carter, Smith, Salter & Barkett, P.A., S. Harvey Ziegler, Kirkpatrick & Lockhart, Miami, Fla., Thomas F. Noone, Emmet Marvin & Martin, New York City, for The Bank of New York.

Herbert Stettin, Herbert Stettin, P.A., Miami, Fla., for Fred Stanton Smith.